342 F.2d 737
 144 U.S.P.Q. 695
 IMPERIAL CHEMICAL INDUSTRIES LIMITED, Plaintiff-Appellant,
v.
NATIONAL DISTILLERS AND CHEMICAL CORPORATION, Defendant-Appellee.
 No. 328, Docket 29399.
 United States Court of Appeals Second Circuit.
 Argued Jan. 28, 1965.
Decided March 12, 1965.
 
 John R. Schoemer, Jr., New York City (Philip D. Pakula, Richard J. Barnes, and Townley, Updike, Carter & Rodgers, New York City, on the brief), for plaintiff-appellant.
 Edward J. Ross, New York City (Stephen R. Lang, and Breed, Abbott & Morgan, New York City, on the brief), for defendant-appellee.
 Before WATERMAN, SMITH and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 This case concerns alleged violations of certain licensing agreements for the manufacture of polyethylene or polythene discovered and developed originally by the appellant, Imperial Chemical Industries Limited (hereinafter called I.C.I.).
 
 
 2
 As the result of a decree of the United States District Court for the Southern District of New York in a civil anti-trust suit, United States v. Imperial Chemical Industries, Ltd., 100 F.Supp. 504 (1951) and 105 F.Supp. 215 (1952), I.C.I. was ordered to grant licenses to use its polyethylene process to all bona fide applicants in this country who should apply for it. I.C.I. was also ordered to provide, for reasonable royalties, each such licensee with a manual particularly describing its 1950 polyethylene technology, subject to a restriction against disclosure of 'any of the contents for fifteen years.' One of the applicants was National Petro-Chemical Corporation (hereinafter called Petro) which, after negotiations with I.C.I., entered into an agreement with it on February 12, 1953 for a non-exclusive, non-assignable license under I.C.I.'s basic United States patents to make, use and sell polyethylene in return for certain royalty payments. Petro sought more current and more valuable information regarding the process and on March 16, 1953, two additional agreements were entered into which the trial court in its finding described generally as follows:
 
 
 3
 '(a) The 'Manual Agreement' which provided that I.C.I. would supply Petro with I.C.I.'s manual and related drawings describing the methods, equipment and processes used by I.C.I. as of July 1, 1952, in its high pressure polyethylene process.
 
 
 4
 '(b) The 'Technical Assistance Agreement' which provided that I.C.I. was to provide Petro with technical assistance and advice in the design, erection and starting up of a polyethylene plant in the United States. This technical assistance was to include visitation and studying by Petro personnel of I.C.I.' § research and production installations, studying by Petro personnel of additional I.C.I. drawings and reports, and the training by I.C.I. of Petro's managerial, operating and research personnel, as well as technical consultation of I.C.I. personnel by Petro. The cut-off date for this technical assistance and information was December 1, 1955, as subsequently agreed to by Petro and I.C.I.'
 
 
 5
 Three years later, after I.C.I. had developed a process for the production of high density polyethylene, as compared with the low and intermediate density polyethylene which were the subject matter of the March 16, 1953 agreements, Petro and I.C.I. on July 11, 1956 entered into another non-exclusive and non-assignable license contract known as the 'High Density Agreement' which covered I.C.I.'s United States Patent applications and any patents issued thereafter concerning the production of high density polyethylene. The trial court further described this agreement as follows:
 
 
 6
 'In addition, the agreement provided that I.C.I. would make available all technical assistance and advice, including drawings and specifications, required fully to inform Petro in the theory and applications of the methods and techniques of construction, operation and maintenance as developed by I.C.I. for exploiting commercially this extension of its process. Under the agreement the cutoff date for supplying information was June 30, 1958, but was subsequently extended to December 31, 1958.'
 
 
 7
 The trial court found that subsequent to the preparation and delivery of the manual in 1952, the I.C.I. process for low and intermediate density polyethylene underwent development and improvement. Petro was kept fully informed of these changes in monthly technical progress reports through November, 1955. It also found that some of the information disclosed under the High Density Agreement related to and was used by Petro and later by the appellee, National Distillers and Chemical Corporation (hereinafter called National) with which Petro merged in 1959. I.C.I. also, through 1958, provided Petro with considerable information, technology and know-how on the design, construction, operation and process of a stirred autoclave reactor, which is the device with which this case is principally concerned.
 
 
 8
 Petro set up its plants and used, in addition to the information which it obtained pursuant to the licensing agreement with I.C.I., technology which was in part similar to portions of the I.C.I. disclosures and in part acquired from other sources, including its own development and research. As time and experiment in the industry went on, the great majority of the items disclosed by I.C.I. to Petro and National pursuant to the agreements became generally known and in the public domain through sources other than Petro and National. The appellant has asserted in the present action that one of the most important items, however, was not in the public domain, and that was the reactor which is the vessel in which ethylene is polymerized under conditions of high temperature and pressure to form polyethylene.
 
 
 9
 National built a reactor which it designated as its R101 which, although different in some respects from I.C.I.'s Mark I, was found by the trial court to be substantially similar to it. In 1963 National made a contract to supply Toyo Soda Manufacturing Co. of Japan (hereinafter called Toyo) with the technical information necessary to construct and operate a plant in Japan for the commercial production of polyethylene by a high pressure process. It is the making of this contract which precipitated the bringing of the present action for a declaratory judgment, temporary and permanent injunctions and an accounting. The parties stipulated that the action would for the purpose of the trial be limited to the issue of disclosure of the reactor, which I.C.I. claims was its trade secret and which under the terms of the agreements National was forbidden to reveal to Toyo. National, in effect, claims that everything about the reactor, as taught to it under the license from I.C.I., had become generally known and was in the public domain, and that disclosure was therefore permissible. National also argues that the contracts were so confusing and ambiguous that they cannot be used as a basis for granting equitable relief.
 
 
 10
 The trial court found that the reactor, more specifically called the stirred autoclave reactor, had nine cardinal features or components,[1] only one of them, the use of a motor within the vessel to operate the stirrer, was unique and not in the public domain; the other eight as separate components were generally known. However, in addition to this single unique component, the unified description of the design, process and operation, i.e., the way in which all of the features were interrelated, the know-how by which it was done and the method of making it work, was also still a secret. The court found that the development of such design, know-how and method of operation, if developed only from the features which were already in the public domain, would require extensive research, trial and error and a great expenditure in effort, time and money.
 
 
 11
 In its conclusions of law the trial court said,
 
 
 12
 'Were this an ordinary trade secret case * * * injunction would issue. * * * This, however, is not such a case because the rights and obligations of the parties which might otherwise obtain have been altered and defined by the agreements which they made.'
 
 
 13
 In examining this crucial conclusion of the trial court it is necessary to scrutinize the agreements themselves to determine, if possible, what the parties intended by what they said.
 
 
 14
 The controlling provisions of the agreements relating to secrecy are set out in the trial court's finding as follows:
 
 
 15
 'In addition to a number of other conditions not here pertinent, both the Manual and Technical Assistance Agreements contained provisions restricting the disclosure of I.C.I. information and technology to third parties. Specifically, the Manual Agreement provided that until March 16, 1968, Petro: "* * * shall treat as confidential the contents of the manual and drawings to be provided by I.C.I. hereunder so far as the same are acquired solely from or from the use of the said manual or drawings and shall not disclose the same to any person other than * * *'
 
 
 16
 certain regulated and controlled disclosures to employees, suppliers or contractors who would agree not to make further disclosures or use.
 
 
 17
 'The Technical Assistance Agreement provided that until March 16, 1968, Petro:
 
 
 18
 "* * * shall treat as confidential all technical and other information and advice, and any drawings or specifications communicated or provided solely by I.C.I. hereunder or resulting directly from the use of the same by (Petro) and shall not disclose the same to any person other than * * *'
 
 
 19
 certain regulated and controlled disclosures to employees, suppliers or contractors who would agree not to make further disclosures or use.'
 
 
 20
 'In addition to a number of other conditions not here pertinent, the High Density Agreement contained a provision restricting disclosure of I.C.I. information and technology to third parties. Specifically, it provided that until March 16, 1968, Petro:
 
 
 21
 "* * * shall treat as confidential all technical and other information and advice and any drawings or specifications, communicated or provided by I.C.I. hereunder and shall not disclose the same to any person other than * * *'certain regulated and controlled disclosures to employees, suppliers or contractors who would agree not to make further disclosures or use.'
 
 
 22
 'The Manual Agreement, the Technical Assistance Agreement and the High Density Agreement each contained provisions for the release of the secrecy obligations with respect to any part of the information furnished by I.C.I. under the applicable agreement which became a matter of public knowledge. Specifically, the Manual Agreement provided:
 
 
 23
 "If any part of the information contained in the said manual or drawings becomes a matter of public knowledge otherwise than through default of Petro-Chemicals and Petro-Chemicals wishes to be released of its secrecy obligations under this clause in respect of such information, I.C.I. will not unreasonably withhold its consent to such release provided, however, that in no event shall Petro-Chemicals be liable to I.C.I. for the unintentional disclosure of any information contained in said manual and/or drawings which has become generally available to the public.' 'A substantially identical provision was contained in paragraph 16 of the Technical Assistance Agreement and paragraph 8 of the High Density Agreement.'
 
 
 24
 Although, in view of remarks by the experienced trial judge and by counsel which characterized the agreements as confusing and ambiguous, we hesitate to find meaning where they did not, nevertheless, what the parties intended by what they said seems to us to be reasonably clear. The trial court's construction of the three agreements, on which he based his denial of equitable relief, turn on the words in the provisions of each which call for the confidential treatment of 'information * * * acquired solely from or from the use of the manual or drawings * * *', and 'information * * * communicated or provided solely by I.C.I. hereunder or resulting directly from the use of the same' by Petro; and 'information and advice and any drawings or specifications communicated or provided by I.C.I. hereunder.'
 
 
 25
 As the trial court found, in considering the circumstances in which the agreements were made, rapid developments had been and were being made in the field of polyethylene production. I.C.I. was acting under compulsion of a court order in making the licensing agreements. It wanted particularly to preserve as much advantage as it could to itself in keeping its trade secrets confidential with itself and its licensees but at the same time it did not want to flirt with further difficulties by attempting to secure a trade secret monopoly over matters no longer secret.
 
 
 26
 Petro, at the time of the making of the agreements was an established chemical manufacturing company and it did not want any parts of the technology which it was already using in its own business to come under the restrictions of the licensing agreement with I.C.I. just because some part of the polyethylene process being disclosed happened to be similar. Both parties had reason to confine the secrecy obligations of the agreements to 'information contained in and acquired solely from or from the use of the drawings to be made available' or which was 'communicated or provided solely by I.C.I. hereunder or resulting directly from the use of the same.' 'Solely' clearly meant information which Petro learned for the first time from I.C.I.
 
 
 27
 Petro, as well as I.C.I., was also interested in a provision and a procedure whereby Petro could be released from the secrecy restrictions of the agreement as to any part of the information which it had acquired solely from I.C.I.'s manual and drawings or from the use of them, when such part became, through the agency of another, public knowledge and thus a part of the public domain. The parties therefore incorporated into all the agreements a flexible provision under which Petro could apply to I.C.I. for a release from the secrecy obligation, as it applied to any such part, and I.C.I. could not unreasonably withhold its consent.
 
 
 28
 The construction given by the trial court, however, to these determinative portions of the agreements is not fully warranted. In the last portion of its fourth conclusion of law the court said,
 
 
 29
 '* * * the only purpose of the word 'solely' was to confine the disclosure restriction to technology acquired solely from I.C.I. or from the use of the manual or drawings. Therefore, to the extent that the concepts and ideas here involved were not acquired solely from I.C.I. or solely from the use of the manual or drawings, there is nothing in the Manual Agreement which in any way restricts National from making disclosure. Accordingly, National is free to disclose all of the matters which the Court has found to be in the public domain.'
 
 
 30
 Had the court limited its statement to those parts of concepts and those parts of ideas which the court found to be in the public domain, which parts would thus, under the agreements, have been proper subjects for the release procedure, there could be little disagreement with it, but its interpretation of the contract appears to say that, to the extent that there were under the licensing agreement whole concepts and whole ideas which are partly made up from I.C.I.'s secrets and partly made up from matters of general public knowledge, then such a whole concept or idea cannot be said to be solely made up from I.C.I.'s secrets and therefore the whole concept and the whole idea-- secret part and all-- may be disclosed by the licensee. This interpretation clearly reappears in reading the pertinent parts of the fifth conclusion of law which says,
 
 
 31
 'Also, information which National acquired * * * partially from sources other than I.C.I. * * * cannot be deemed to have been acquired solely from I.C.I. * * *'
 
 
 32
 If the word 'partially' had been omitted the statement would have been unexceptionable.
 
 
 33
 We have considered whether in the light of the wording of all of the findings and conclusions the court could have meant that if the whole concept or the whole idea or the entire item of information was disclosed in full under the agreements with I.C.I. and was also disclosed in full by another source which showed the information to be in the public domain, then National would be in a position to be released of any obligation of secrecy under the agreements. But the court's ultimate conclusion that National should be left free to disclose to Toyo all information relating to the design, construction, or operation and process of National's Reactor R101 or of a substantially similar stirred autoclave reactor, in spite of the fact that the unified description of the process was secret at the time of the agreements and was still secret at the time of the trial, makes it clear that the trial court misconstrued the secrecy provisions of the agreement. Properly read and applied these provisions do not remove this trade secret case from the operation of the general principle that a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret. Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 921 (7th Cir. 1953), cert. denied 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954); Smith v. Dravo Corp., 203 F.2d 369, 374 (7th Cir. 1953); Allen Mfg. Co. v. Loika, 145 Conn. 509, 515, 144 A.2d 306, 309 (1958); Sun Dial Corp. v. Rideout, 16 N.J. 252, 257, 108 A.2d 442, 445 (1954); Head Ski Co. v. Kam Ski Co., 158 F.Supp. 919, 923 (D.Md. 1958).
 
 
 34
 With regard to the unified description of the overall novel process in this case, the trial court found as follows:
 
 
 35
 'The literature available to the public describes some of the general concepts and most of the design, construction, operation and process components involved in the I.C.I. Mark I stirred autoclave reactor for polyethylene production, as disclosed in the manual and under the Technical Assistance Agreement. However, there is no unified description anywhere in the literature of the process, design or operation of I.C.I.'s Mark I stirred autoclave reactor. Although the components of such reactor are available in the literature, development of the know-how as a totality successfully and safely to operate a commercial process using such a reactor based upon information in the public domain would have required vast research, at great expense in money and time, plus considerable trial and error over an extended period of time. In making its agreements with I.C.I., it was obviously Petro's purpose to avoid the difficulties and the time and expense that would be required to arrive at a commercially feasible process from a synthesis of the information disclosed in the literature and independently of disclosures of the secret processes and trade secrets made by I.C.I.'
 
 
 36
 It is no defense in an action of this kind that the process in question could have been developed independently, without resort to information gleaned from the confidential relationship. As stated in the landmark case of Tabor v. Hoffman, 188 N.Y. 30, 35, 23 N.E. 12 (1889):
 
 
 37
 'Even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained.'
 
 
 38
 Although the court went on to say that anyone is at liberty to discover the secret and use it thereafter with impunity, that fact does not excuse the obtaining of a secret by improper means or the inequitable use of the same. Herold v. Herold China & Pottery Co., 257 F. 911 (6th Cir. 1911); Schavoir v. American Re-Bonded Leather Co., 104 Conn. 472, 133 A. 582 (1926); International Industries, Inc. v. Warren Petroleum Corp., 99 F.Supp. 907 (D.Del.1951).
 
 
 39
 Although in its finding, the trial court found that a unified description of the process was still a secret, known only to I.C.I. and its licensees, it made no reference to it in its conclusions of law. Presumably it simply felt that under its interpretation of the secrecy provisions of the agreements, the fact that eight of the nine components were matters of public knowledge and therefore in the public domain and only the component relating to the motor enclosed within the reactor and the unified description of the way the components were put together and made to work were still secret, the whole process could not any longer be said to have been solely acquired from I.C.I. and that therefore National was free to disclose everything about it to Toyo. As we construe the agreements, however, any material part of the information which Petro first learned from the manual and drawings or first learned from the use of the manual and drawings, which was still secret at the time of the trial, is a trade secret of I.C.I. for which equitable protection may be afforded.[2]
 
 
 40
 Indeed, in reflecting on the siscussions of the whole process involved in this case and the importance of the reactor, it appears at least doubtful that there would be much of a demand for the information contracted to be sold by National to Toyo if the unified description of the process, design and operation of the stirred autoclave reactor were withheld. If National's R101 reactor is substantially similar to I.C.I.'s Mark I and if, as National argues, it and everything else in the means and method of production is in the public domain, it is not very clear why Toyo is paying about $6,000,000 for information it could so easily get from a technical library. With the close similarity between the Mark I and the R101 it would be surprising if improvements by National were worth that much. If an important part of what Toyo seeks is the still secret know-how in putting the components of the reactor together and making them work effectively, then it is unfair for National to reap a financial return by breaching the non-assignable licensing agreements, and by taking a payment for something which is I.C.I.'s to license and, in the course of doing so, disclose I.C.I.'s trade secret to the world, unless Toyo is also placed under secrecy restrictions. In considering all of the equities it should be recollected that I.C.I.'s disclosure of its trade secret to licensees was compelled in the public interest. In framing the order the court decreed what it considered equitable terms which gave full recognition to the public interest and which designated the legitimate area for the preservation of I.C.I.'s trade secret. As long as I.C.I. operates within the permissive bounds of the decree, equitable protection should not be withheld, without some reason, in circumstances where it has usually been granted. Franke v. Wiltschek, 209 F.2d 493, 496-498 (2d Cir. 1953).
 
 
 41
 One other aspect of this case requires discussion and that concerns the trial court's finding that I.C.I. waived that portion of the agreements which provided a flexible procedure for releasing National from the secrecy limitations of the agreements when through the agency of others a part of the secret information became public knowledge. The court said,
 
 
 42
 'Although National failed to resort to the mechanics provided in the agreements for release from its secrecy obligation as to any part of the information furnished by I.C.I. which was in the public domain, in the course of conversations which took place from February to May of 1964, looking to a compromise of this dispute, I.C.I. waived any right it may have had to estop or preclude National because of such failure from disclosing to third parties any part of such information which was in fact in the public domain.'
 
 
 43
 Appellant objects to this finding. The evidence upon which it rests[3] makes it plain that I.C.I. was only temporarily and conditionally refraining from pressing this issue in the period of negotiation. To find that it constituted a waiver of an important provision of the contract was clearly erroneous. West v. Smith, 101 U.S. 263, 25 L.Ed. 809 (1879); Edward Valves, Inc. v. Cameron Iron Works, Inc., 286 F.2d 993, 938-939 (5th Cir. 1961), cert. denied 368 U.S. 833, 82 S.Ct. 55, 7 L.Ed.2d 34 (1961); White v. Old Dominion Steamship Co., 102 N.Y. 660, 6 N.E. 289 (1886); In the Matter of Ex-Lax Inc., 21 A.D.2d 786, 280 N.Y.S.2d 572, 575 (1964).
 
 
 44
 National argues that because I.C.I. failed to raise and press, in its correspondence, affidavits and statements preliminary to the trial of this case, the matter of the release procedure set out in the agreements but, instead, addressed itself to discussions of the ultimate issue, the nub of their disagreement, which was whether certain parts of the secret information had become public knowledge-- a matter which had to be dealt with whether National had raised it by way of the release procedure or not-- cannot be found to imply a waiver of an explicit provision of the agreements. The intentional relinquishment of a clearly expressed right cannot be inferred from the particular tactical conduct of the appellant in the preliminaries which led up to the trial, which are referred to by the appellee.
 
 
 45
 The cause is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 In furtherance of the court's order re the impounding of certain papers, the material included in this footnote will not be released for publication
 
 
 [2]
 The trial court's finding, concerning the unified description of the process as a whole, makes it clear that this portion of the disclosure made to Petro and National under the licensing agreements was secret at the time of the trial and was not a process obvious to one skilled in the trade. 1 Nims on Unfair Competition and Trade-Marks 143 at 407 (4th ed. 1947); Turner, The Law of Trade Secrets, p. 430 (London 1962). There was no finding as to the adequacy of the remedy at law which gave any weight to the fact that the disclosure of secrets was to be made to a foreign corporation in a foreign country where the ascertainment of damages might well be extremely difficult, if not impossible to make. Foundry Services Inc. v. Beneflux Corp., 206 F.2d 214, concurring opinion of L. Hand, J., at 216 (2d Cir. 1953). The matter of equitable relief was also discussed in Franke v. Wiltschek, 209 F.2d 493 (2d Cir. 1953); Colgate-Palmolive Co. v. Carter Products, 230 F.2d 855, 865 (4th Cir. 1956), cert. denied 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956), rehearing denied 352 U.S. 913, 77 S.Ct. 152, 1 L.Ed.2d 120 (1956); Allen-Qualley Co. v. Shellmar Products Co., 31 F.2d 293 (N.D.Ill.1929), aff'd 36 F.2d 623 (7th Cir. 1929)
 
 
 [3]
 Portions of cross-examination of plaintiff's witness Valois by Attorney Ross, defendant's counsel:
 'Q. Do you recall that I stated that one of the positions of National was that much or substantially all of the ICI technology as disclosed was now a matter of public information? A. I recall this as a reiteration of what was in the correspondence preceding that meeting.
 Q. You had seen the correspondence? A. I had seen some of it, at any rate.
 Q. Do you recall that I pointed out a provision of the contract as to the release of information which became a matter of public knowledge and asked Mr. Schoemer whether this was a provision that ICI was standing on? A. I recall that.
 Q. And what was the answer I received? A. My best recollection is that Mr. Schoemer's reply to that was to the effect that his client was-- I don't know whether he said his client or 'We are not at the moment making any issue of this.'
 That was the tenor of his words. I have no verbatim record of it.
 Q. That the client was not making any issue of this? A. I don't recall now whether he said the client or he.
 Mr. Schoemer: 'At this time,' he said in his answer, Mr. Ross.
 Mr. Ross: I would be happy to have you straighten out what you said, Mr. Schomer. I will accept your statement.
 Mr. Schoemer: No, thank you.
 Q. Now you say that you reviewed the correspondence between ICI and National? A. Yes.
 Q. And it is not a fact that in this correspondence National also pointed out that it was relying upon the fact that the ICI technology was old, and now in the literature and public domain? A. I think words to this effect were used more than once.
 Q. And each letter received a response, did it not? A. Yes.
 Q. In any of the replies received from officials of ICI did any of them point out that if this was National's position it should apply for release under the provisions of the contract? A. Well, to be quite certain I would prefer to have the correspondence tabled.
 Q. Do you have the correspondence with you? A. I personally do not have it in court.
 Mr. Ross: May we withhold that and refresh his recollection after lunch?
 The Court: Yes. You may look at it during the lunch hour-- aid digestion.
 Q. Mr. Valois, during the luncheon recess did you consult the correspondence between ICI and National during last spring and winter to refresh your memory as to the contents of the correspondence? A. Yes, I have consulted those parts of the correspondence that you have shown me here.
 Q. And is it not a fact that in the correspondence National took the position that all or substantially all of the ICI technology was now a matter of public knowledge? A. Yes. This was Mr. Marsh's position.
 Q. And this was disputed, was it not, by ICI? A. It was.
 Q. And did ICI at any point during the correspondence refer to the fact that under the contract there was a provision for applying to ICI for the release of matters which had become public knowledge? A. No, I don't believe this was raised by either side in the correspondence.'