**UNITED STATES of America,**
**Plaintiff,**

v.

**IMPERIAL CHEMICAL INDUSTRIES, LTD.,** Imperial Chemical Industries (New York), Ltd., E. I. Du Pont de Nemours and Company, Inc., Remington Arms Company, Inc., Lammot du Pont, Walter Samuel Carpenter, Jr., and Charles Krum Davis, Defendants.

Civ. A. No. 24-13.

United States District Court
S. D. New York.

May 10, 1966.

Donald F. Turner, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for the United States (William D. Kilgore, Jr., and Elliott H. Moyer, Washington, D. C., of counsel).

Coudert Brothers and Townley, Updike, Carter & Rodgers, New York City, Sigmund Timberg, Washington, D. C., for Imperial Chemical Industries, Ltd. (Joseph A. McManus, John R. Schoemer, Jr., and Richard J. Barnes, New York City, of counsel).

Breed, Abbott & Morgan, New York City, for National Distillers & Chemical Corp., amicus curiae (Edward J. Ross and Stephen R. Lang, New York City, of counsel).

Covington & Burling, Washington, D. C., for E. I. DuPont de Nemours & Co., Inc. (G. A. Gesell, Washington, D. C., of counsel).

RYAN, Chief Judge.

In 1953, defendant ICI entered into a series of patent and knowhow agreements. Now, almost thirteen years later, and two years before these agreements are about to expire, the Government moves this Court for a declaration that certain provisions of these agreements are in violation of the Final Judgment

entered July 30, 1952, in United States v. ICI et al., 100 F.Supp. 504; 105 F. Supp. 215, and prays that defendant be enjoined from enforcing these provisions.

The specific declarations sought are: one, that the period during which ICI might lawfully restrict disclosure of its secret process by its licensees under the terms of the Judgment expired on June 30, 1965; and, two, that irrespective of this termination date, the restrictions against disclosure and use imposed by ICI in these agreements on technology "developed by the licensee" and in the "public domain" is unlawful and should be enjoined. As to the first part of the relief sought, we note that the agreements clearly fix varying dates in 1968 for the termination of the confidentiality restrictions. No construction of the agreements is required; we need only refer to the Final Judgment to see if these dates violate it. The second part of the relief sought requires a reading of the agreements to determine if the language employed provides what the Government contends it does and is therefore a violation of the Final Judgment.

In support of its position the Government relies on the terms of the agreements, and on the legal position taken by ICI in contemporaneous civil litigation in this Court with one of its licensees as demonstrating the interpretation which ICI gives to the challenged provisions. ICI disputes the Government's interpretation of the agreements and rests on the agreements themselves and on the affidavit of Forsyth, the employee who, on behalf of defendant ICI, negotiated the agreements with the licensees following the entry of the Final Judgment. None of the recitals in this Forsyth affidavit are contradicted by the Government.

The licensee with whom ICI is presently in litigation is National Distillers (formerly National Petro-Chemical Corp.,) against whom ICI had sought an injunction to prevent it from disclosing ICI's secret process in violation of the agreement between them. (Imperial Chemical Industries Limited v. National Distillers, 342 F.2d 737; and 354 F.2d 459 (CA2–1965).

During the litigation National Distillers, resisting the injunction on the ground, among others, that the agreements violated the Final Judgment, sought the participation of the Department of Justice, Anti Trust Division, and when this proceeding was commenced by the latter National Distillers applied for permission to intervene. This application was opposed by ICI because National Distillers was an adversary engaged in adversary proceedings; the Government opposed the intervention but not National Distillers' appearance as "amicus." We granted it permission to file a brief amicus curiae. National Distillers by brief now has joined with the Government in asking this Court to take judicial notice of the suit pending between it and ICI. We have taken notice of this suit pending here and later will consider and discuss its relevance to this proceeding.

We turn first to the question of whether the language of the agreements went beyond the bounds of the Final Judgment. This Court in an Opinion on Remedies, filed in May 1952, prior to the entry of the Final Judgment, directed ICI to license not only its patents but its trade secrets, "because the supplying of such knowhow and technology is necessary to the efficient use of the licensed patents and to the production by the licensee of products comparable in quality and cost of production to that of the licensor."

Accordingly, Article IX(9) of the Judgment directs ICI to furnish to all licensees of its patents "a written manual or other descriptive material describing the methods and processes used by ICI in practicing commercially as of June 30, 1950, in the manufacture of such products, the inventions claimed in the patent so licensed. The furnishing of such manuals shall be unconditional except that: (b) ICI may require as a condition of the furnishing of such a manual that the licensee (1) for 15 years shall not

disclose any of the contents of the manual to any third person, and (2) shall use the technical information contained therein only in its manufacturing operations in the United States."

Article IX (11) upon similar conditions provides for the furnishing to any licensee upon request of "a written manual describing the methods and processes found prior to June 30, 1950 by ICI in a commercial plant, pilot plant or semi-works, to be usable in practicing commercially the inventions claimed in the licensed patents, but which were not on that date being applied by ICI."

Pursuant to these provisions ICI entered into a set of agreements: a License Agreement, a Manual Agreement and a Technical Assistance Agreement with four separate companies on the following dates: with Spencer Chemical Co. Manual and Technical Assistance agreements on March 3 and 4, 1953, respectively; with Dow Chemical Co. on March 12, 1953; with Eastman Kodak Co. on May 13, 1953; and with National Petro-Chemical Co. (later National Distillers) on March 16, 1953.

Raised by this motion are three types of objections to the provisions of these agreements. The first grouping concerns the confidentiality provisions restricting disclosure by the licensees; the second grouping deals with restrictions on the use of technology outside the United States; and the third grouping of objections is directed to the expiration date of all restrictive provisions. The language of the confidentiality restrictions differs in the agreements, and for convenience in our consideration we have classified them into two groups. We note here that certain portions of these agreements are common to all.

Each Manual Agreement is described therein as having been entered into pursuant to the Final Judgment and each contains a recital that under the provisions of the Judgment ICI is obligated to furnish to any applicant who has been granted a license pursuant to the Judgment and who intends to manufacture thereunder common chemical products as defined in the Judgment a written manual describing the methods and processes used by ICI as of the 30th day of June, 1950 in practicing commercially in the manufacture of such products the inventions claimed in the U.S. Letters Patent so licensed, and that the licensee intends to manufacture polythene under the license but is desirous of obtaining and has therefore requested ICI to provide more valuable and up-to-date technical information relating to the methods and processes of manufacturing polythene granules than ICI is obligated to supply under the Judgment and that ICI has agreed to provide such more valuable and up-to-date information on the terms and conditions therein contained.

The agreements then go on to recite that ICI shall furnish written manuals, describing the methods, equipment and processes used by ICI in the manufacture of polythene granules as of the first day of July 1952 together with drawings relating to such methods, processes and equipment.

The Technical Assistance Agreements, of various dates in 1953, while they do not refer to the Final Judgment, do recite the execution of the License and Manual Agreements (entered into pursuant to the Judgment). They also record that the licensee has requested ICI to provide it with technical assistance and advice in the starting up of the manufacture of polythene and agree that ICI will provide technical assistance and advice, including the provision of such drawings and specifications as ICI may consider necessary, relating to methods and techniques of construction, operation and maintenance of plants for commercial manufacture of polythene not in commercial operation on July 1st, 1952 and which are subsequently put into commercial operation, or are intended for commercial operation and for which ICI has given financial sanction, prior to the start-up, as therein defined, of Petro-Chemicals' plant or within four years from the date of this Agreement, whichever shall be earlier.

The confidentiality provisions in Group I are:

A. The licensee "shall treat as confidential the contents of the manual and drawings to be provided by ICI hereunder" (Spencer Manual Agreement Par. 6).

B. The licensee "shall treat as confidential all technical and other information and advice and any drawings or specifications communicated or provided by ICI hereunder" (Spencer Technical Assistance Agreement Par. 16; Eastman Kodak Technical Assistance Agreement Par. 16).

And in Group II:

A. The licensee "shall treat as confidential the contents of the manual and drawings to be provided by ICI hereunder so far as the same are acquired solely from or from the use of the said manual or drawings" (Dow Manual Agreement Par. 6; National Petro-Chemicals Manual Agreement Par. 6; Eastman Kodak Manual Agreement Par. 6.).

B. The licensee "shall treat as confidential all technical and other information and advice and any drawings or specifications communicated or provided solely by ICI hereunder or resulting directly from the use of the same by" the licensee (Dow Technical Assistance Agreement Par. 16; National Petro-Chemicals Technical Assistance Agreement Par. 16).

The Government accepts the wording of the Group I clauses as being in conformity with the Final Judgment, but not the interpretation which ICI gives it.

The Government attacks both the wording and ICI's interpretation of the Group II clauses.

Related to the provisions is the further clause found in all the Agreements to which the Government objects that if any part of the information, drawings or specifications becomes a matter of public knowledge otherwise than through default of the licensee, and the licensee wishes to be released of its secrecy obligations under this clause in respect of such information, ICI will not unreasonably withhold its consent to such release provided, however, that in no event shall the licensee be liable to ICI for the unintentional disclosure of any such information, drawings or specifications which has become generally available to the public.

The second objection goes to the language of the Technical Assistance Agreements which provides that the licensee shall not use any technical and other information and advice, drawings or specifications communicated or provided by ICI hereunder in the manufacture of polythene outside the U.S.A., its territories and possessions.

The third objection is to the duration of the confidentiality period of fifteen years by making its starting date in all these agreements "for fifteen years from the execution of this Agreement."[1]

Because it is most difficult to understand the Government's legal position, it seems best to answer the problem as it is posed by the Government in its own words:

"The immediate questions presented by this motion are (1) whether subsection IX 9(b) permits ICI to impose conditions that licensees shall not disclose to third persons technical information developed by licensees, i. e. technical information resulting from the use of ICI manuals and that licensees shall not use technical information in the public domain or licensee developed technology outside of the United States, and (2) whether the starting date for the authorized fifteen year period of nondisclosure of the contents of the ICI technical manuals and drawings is June 30, 1950.

"The first question arises because ICI has included in contracts for the supplying of the technical manuals, covering information required to be

---

1. Although some of these Agreements were entered into later than the first one and even as late as 1955, ICI has agreed to use the date of the earliest agreement—March 3, 1953—to start the fifteen years running for all.

furnished under the judgment, prohibitions against licensees disclosing to third persons technology 'acquired * * * from the use of said manuals or drawings' and prohibitions against such disclosure of technical and other information 'resulting directly from the use' by licensees of the ICI communicated drawings, specifications or other information. With similar wording ICI has imposed restrictions in such contracts on the use outside the United States of licensee developed technology. In addition ICI has imposed a requirement that such of the contents of the manuals which have become a part of the public domain may not be disclosed to third parties without the consent of ICI, and has not expressly provided that information in the public domain may be used outside the United States."

Defendant is in agreement with the Government to the extent that it may not restrict (1) Technology developed by the licensee; (2) Information already known when acquired from ICI, e. g., because of the licensee's other chemical operations; (3) Information acquired by the licensee from third persons; and (4) Technology that, after disclosure to the licensee, enters the public domain by disclosure in patents or the like, but it adds "provided that it does not thereby disclose still-secret ICI technical information." ICI says that the language of the Agreements, chosen by the licensees, does not compel or even justify the interpretation which the Government seeks to force on it, and that in its dealings with its U. S. licensees, and up to the present, including its litigation with National Distillers and Chemical Corporation it has interpreted its Manual and Technical Assistance Agreements: (a) As having been made in compliance with the Final Judgment herein; (b) As leaving the licensees free, during the fifteen-year secrecy period, to disclose or deal in technology (1) Developed by them; (2) Already known to them when acquired from ICI; (3) Acquired by them from third persons; or (4) Becoming public knowledge; unless such action would re-

sult in an unauthorized disclosure of still-secret ICI technical information contained in the manual or supplied under the Technical Assistance Agreements.

It is this last restriction on disclosure of other source technology, if it would result in disclosure of ICI secret technology, which creates the difference of opinion between ICI and the Government. Before settling that difference we dispose of a defense raised by ICI in its answer to this motion, which is that the Technical Assistance Agreements were not entered into under Article IX(11) of the Final Judgment, as the Government's motion charges, or under any other article of the Judgment.

ICI's argument rests on the undisputed fact that as part of its licensing of these companies it engaged in a vast technical assistance program under which it trained the licensee's personnel in all facets of polythene production, including management, operation and research; assisted it with the design, erection and start-up of its plants, and permitted it to study and inspect ICI's own drawings and reports and its research and production installations—all of which it says was more than the Judgment directed it to do, and that the Agreement therefore is not subject to the limitations of the Judgment.

It also rests on the fact disputed by the Government that these Agreements encompassed "technology not used" or "usable" as of June 30, 1950—so as to bring them within either Paragraphs 9 or 11. This is a dispute which cannot possibly be resolved on this motion and which need not be in order to reach a decision.

While all that ICI says may be true, ICI has really answered its own argument when it admits that the manuals were insufficient in themselves to adequately prepare its licensees to enter into competition, that the two sets of agreements were complementary to each other and furnished as part of the knowhow assistance program, with the provisions of the Final Judgment as the basic framework. Urging, now, that these

agreements were "patterned upon the provisions of the Final Judgment" and that the fifteen-year restrictions against disclosure were "in harmony with the Judgment," ICI seeks a declaration that the "various licensing agreements are in full compliance with the judgment."

It is against the Judgment, therefore, that we test the provisions of both sets of agreements. ICI entered into the Technical Assistance Agreements without requiring a further order of the Court as contemplated by Paragraph 10 of Article IX of the Final Judgment—a fact which shows its unquestioned obedience to our mandate.

Taking off from the words of Clause 9(b) (2) of Article IX, "contents of the manuals," the Government moves forward with the argument that the only disclosure which ICI may lawfully restrict is disclosure of "the contents of the manuals and descriptive materials supplied by ICI," and concludes that "technology, improvement and inventions developed by the licensee in the use of and practice of the ICI disclosed technology" cannot by definition or construction be included in such "contents." What can be included in the words "descriptive materials" (words not found in this clause) it does not say; neither does it state what can be included in the words "technical information" and in a "written manual describing methods and processes" found in Clause 11 of the Judgment under which it argues the Technical Assistance Agreements were made.

So far, we understand the Government's position to be this: "Contents of the manuals" and "descriptive materials" (which are not defined) can be restricted; so can "drawings" (see Manual Agreement Group I); "technical and other information and advice and any drawings or specifications communicated or provided by ICI" apparently also may

be (see Technical Assistance Agreement Group I). Standing alone, these are "alright words" but follow them with the words "acquired from the use of said manual or drawings" and "resulting directly from the use" (Manual and Technical Assistance Agreements Group II) and they immediately become "not alright words."

This is now law, as we understand it.

The reason why restrictions on the use-acquired knowhow are not alright, reasons the Government, is that a restraint on information obtained through the use of ICI's technology by its very language effects a restraint on technology developed by the licensee independent of ICI technology, technology learned from a third person and technology which belongs to the public, all of which is unlawful, while a restraint on information gained from a mere reading or copying of the manual and drawings, as contrasted from use, is lawful.

The key to this argument is obviously the word "use," because apart from this the language which the Government finds unlawful per se in Group II actually narrows the restricted information to that which is acquired "solely" from and communicated or provided "solely" or resulting "directly" from ICI. This is exactly what the licensees (which insisted on it) thought it did and intended it to do—among whom we find National Distillers.[2]

It is undisputed that the "lawful" language in Group I was that suggested by ICI after prolonged conferences with one of its applicants. It restrained disclosure on all the contents and all technical and other information furnished by ICI.

Spencer, the first licensee, accepted—but the next in line (Dow) objected on the ground that a flat ban on disclosure of "any of the contents" might prohibit Dow from using manual technology that was already known to Dow in other

---

**2.** Commenting on these provisions the Court of Appeals said that "[b]oth parties had reason to confine the secrecy obligations" and that "solely" clearly meant information which Petro learned

for the first time from ICI. (Imperial Chemical Industries Limited v. National Distillers & Chem. Corp., 342 F.2d 737 (1965)

chemical operations. Accordingly, the Group II language was worked out across the table.

National, the next in line, and the licensee that twelve years later complained to the Government, which had before it both the Group I and Group II language and could have chosen either, accepted the latter without objection.

Eastman Kodak, the last licensee to sign, demurred at the Group II language for its Technical Assistance Agreement (but not for its Manual Agreement), and was thereupon told by ICI that it could take whichever clause it preferred. It chose Group II. Thus in its own negotiations ICI equated the provisions under attack with those the Government finds blameless.

All licensees were represented by counsel throughout the negotiations and were familiar with the details of the Final Judgment. None protested these clauses, but all accepted them as reasonable safeguards designed to protect ICI secret technology from passing into strange hands.

The very language employed on its face contradicts and excludes the meaning the Government is trying to give to it, for if the technology read, copied or *used* is ICI's, then it is not the licensee's, a third person's, or the public's, which of course may not be restrained.

This brings us to the question of whether the language used by ICI, while not unlawful per se, is as interpreted by it a lawful restraint under the Final Judgment.

The interpretation, which ICI presents, is that under the confidentiality provisions of Article IX it may restrict any disclosure which results in a disclosure of the technology it has furnished the licensee under the Manual or the Technical Assistance Agreements irrespective of whether the licensee learns this from a reading of the manual or a use of the technology set forth.

This is what the decree intended; it is odd that now it should have to be explained to the Government—the very party who brought about the entry of the Final Judgment and who participated in its formulation (and from which no one appealed.)

The licensing and disclosure of ICI's trade secrets to a narrowly defined class of applicants was compelled in the public interest. All concerned, however, then also recognized the necessity and justice of preserving the secrecy of ICI's trade secrets from the world at large. The terms of the Judgment expressly provided for this equitable protection.

The entire purpose of the licensing was that applicants put to use the ICI technology in order to be in a position to compete with it, or surpass it. It was anticipated at least by the Court that in the thirteen years during which the licensees were learning and putting to use ICI's technology and its improvements they would develop new methods, processes, results, and patents. Certainly ICI did so anticipate.

As the trial court found in the National Distillers' litigation National through 1955 received monthly technical reports from ICI on the process licensed under the 1953 agreements; in 1956 it received a license covering ICI's patent applications and any new patents to be issued covering a new and advanced process (not required by the decree) and on which it received information and technological knowhow and assistance through 1958—a process which it now claims had gone into the public domain at the same time that it was selling it for 6 million dollars to a Japanese company!

But it was certainly not anticipated or understood that the very result hoped for, in the public interest, would simultaneously put an end to the interest ICI had in preserving the secrecy of its property.

As the Court of Appeals noted, if ICI's secret is a unified whole, a "combination of characteristics and components," a "whole concept or the whole idea or the entire item of information" (342 F.2d 742) which cannot be isolated or separated from the process, result or achievement which the licensee has developed from it, or added to by his own

efforts, or those of third parties, then the entire process is protectible. On the other hand, if any licensee has technology which was acquired from the use of ICI's manual but which does not embody information that was contained in the manual, then that licensee is, of course, free to disclose it.

Because ICI has sought to enjoin National Distillers on the basis that, if the technology in question had in fact been acquired from the use of ICI's manual, a disclosure of that technology would necessarily disclose ICI's technology. National Distillers (and the Government) say that ICI is interpreting its agreements as permitting it to enjoin disclosure of technology independently developed by National or acquired from sources other than ICI. This conclusion just does not follow. The Court of Appeals interpreted the agreements to mean that "any material part of the information which Petro (National) first learned from the manual and drawings or first learned from the use of the manual and drawings, which was still secret at the time of the trial, is a trade secret of I. C. I. for which equitable protection may be afforded" (342 F.2d at 743).

ICI was seeking by its suit to enjoin National from disclosing a complete process to a Japanese company. The primary question was whether particular technology had been published, not whether, having been published, it might be sold by National. There was no evidence that ICI sought to enjoin National's disclosure of any particular item of reactor technology that had become public, or that represented National's own development.

The argument of the Government that the conditions imposed on the licensee by ICI, of establishing that the "licensee developed" technology does not disclose that of ICI, would present to the Court the almost impossible task of analyzing and evaluating ICI's 1950 technology and determining the relationship of such technology to the later licensee developed technology, is just without merit or substance. This presents a question no more difficult or impossible of resolution than any other trade secret or combination patent case.

■ And, answering the Government's objection that ICI has not expressly provided for public domain technology outside the United States, it follows that if the technology is no longer secret it may be used, disclosed or sold anywhere and for all purposes—without need for a specific provision in the agreements.

■ The Government's other objection on this phase is what it calls ICI's "veto" power over the disclosure by a licensee of public domain information.

Again, it is founding its argument on the unproved assumption that the information is in fact "public domain." Of course, if it is in the public domain, as we have already observed, no consent is needed from ICI or anyone else to do anything. But there could very well be a bona fide dispute. It was in anticipation of just this situation that ICI provided what the Court of Appeals described as a "flexible procedure" for determining this (Imperial Chem. Indus. Limited v. National Distillers, 354 F.2d 459, 463). ICI fashioned a provision that served the dual purpose of (a) requiring the licensee to consult with ICI before making a unilateral, and perhaps arbitrary and unwarranted, decision that something had become public, and (b) guaranteeing to the licensee that ICI could not arbitrarily block it from dealing in public information or in its own improvements on public information.

That the Final Judgment is silent in the treatment to be given public domain information does not outlaw the provision so long as it does no violence to the Judgment's letter or spirit. Limited as it is to information which was secret when furnished to the licensee and providing for an unconditional release not to be unreasonably withheld, it is a precaution to protect the interests of both parties, particularly ICI's. The wisdom of this provision later became apparent. It appears that when ICI learned in 1963

through the Japanese trade press of National's agreements to build a polyethylene plant it made oral and written inquiries to National as to how it could disclose polyethylene technology to a Japanese licensee without violating its ICI agreements. National replied that it had developed its own process which it was free to license, adding that a considerable part of the ICI process was now a matter of public knowledge and no longer subject to secrecy, and declined to give any particulars of its process.

With knowledge of National's antitrust objections and the Government's present proceeding, the Court of Appeals remanding the case for trial on the issue of a permanent injunction and damages specifically stated that National, which had failed to invoke the contract procedure for the release of public domain information, would have the burden of proving "that information furnished (by ICI) under the agreements had become a matter of public knowledge." (354 F.2d 464).

This was not obiter. We view it as a most significant and determinative holding. It places National in the equivocal position of establishing that while it may not be liable to ICI because the information is public—it has sold this public information to another for 6 million dollars. Judge Anderson expressed his opinion rather pointedly when he said that if the information was in fact public, as contended by National, then "it is not very clear why Toyo is paying about 6 million dollars for information it could so easily get from a technical library"; and that if it is not public it is unfair for National to reap a financial return and take payment of something which is ICI's (342 F.2d 744).

■ Finally, we reach the question of when the fifteen-year restriction against disclosure commences and expires. The Government says that although Article IX 9(b) (1) does not explicitly state the starting date of the fifteen years for which ICI may impose a condition on non-disclosure of the contents of the manuals, consistency in the interpretation and application of the provisions of the Judgment requires that such starting date be June 30, 1950. It chooses the date because this is the date fixed by the Court to determine which patents and technology were to be licensed and which were not. It was also the date on which the trial ended.

ICI's answer is that the Judgment is quite explicit in stating that the "furnishing" of the manual commences the obligation of non-disclosure which is then permitted to run for fifteen years, and that the date of "furnishing" is a much more logical date than one which would start the period against non-disclosure some two and a half years prior to the furnishing. The logic of this is inescapable. The need for secrecy follows the compelled disclosure.

While June 30, 1950 is certainly significant, especially in that it fixed what technology ICI was to furnish, it did not fix this as the date of the license or manual agreements, nor of the conditions which ICI might lawfully attach to them. Until the decree was entered on July 30, 1952, there was no obligation to license or furnish any manuals; after that date, as in any other decree, in the absence of a time limitation, ICI would have had a reasonable time to comply with it. And, it did.

The evidence is undisputed that soon after the entry of the decree ICI sent its emissary Forsyth to America to negotiate with prospective licensees; that he did this between October 1, 1952 and February 21, 1953 with thirty companies in fifty-eight conferences; and that after twenty-one conferences with the four companies the agreements in question were executed in early 1953.

The Government sees some invidious scheme on the part of ICI to extend the secrecy provisions by two years by dating its manual July 1, 1952 and including in it along with technology developed as of June 30, 1950 technology developed since in order to escape the effect of that date. Again, we view this argument to be without substance.

In the first place, it is 1953, not July 1952, which ICI is using as the starting date; in the second place it had no man-

ual dated 1950. It is quite plain that under the terms of the Final Judgment, if any licensee had demanded a manual dated July 30, 1950, ICI would have been under an obligation to furnish one. Obviously, no licensee in his right mind would or did request the 1950 technology when he could have more advanced technology of later date. If there be the slightest doubt it is removed by consideration of the following statements in the Forsyth affidavit which are uncontradicted: Any manual incorporating ICI polyethylene technology only as of 1950 would have been based on ICI's Winnington plant which had been built in 1942, although it had undergone constant expansion and improvements until about 1950. A Manual containing ICI's 1952 technology, however, would have been based on ICI's newest plant erected at Wilton in 1952. It was obvious that the information contained in the earlier manual would be very much less valuable to a new manufacturer entering into competition in the United States. A licensee would naturally want to have the most up-to-date technology.

Another factor which entered into this decision was that the capital cost involved in building a plant based on ICI's 1950 technology (i. e., based on the Winnington plant) would have been two thirds higher than the capital cost of building a plant based on ICI's more efficient and economical 1952 technology (i. e., based on the Wilton plant). In addition, operating costs were estimated to be 50 per cent lower for the latter.

To meet the Government's objection that one fixed date is required or discrimination will result among the licensees, in that one may be free to disclose the information while another is not, ICI is willing to treat the first expiration date (March 3, 1968—Spencer's Manual Agreement) as the common date on which all licensee secrecy obligations end. We declare that ICI is entitled to enforce the licensee secrecy obligations until March 3, 1968.

We conclude that there is nothing in the language of the agreements with any of its licensees, or in the interpretation ICI has placed on them, or in the attempted enforcement of them, which violates the terms of the decree.

Ordinarily, this belated attack on agreements which for thirteen years have been openly enforced against licensees by ICI under a claim now first asserted that they are in violation of this Court's decree and of antitrust laws, all with the knowledge of the Government, would not warrant the extended discussion we have given each of the Government's objections. Not only has the Government throughout this period had the usual visitation rights, but it is expressly provided that "whenever a request for a manual is received, ICI shall immediately advise the United States Department of Justice," and the furnishing of all licenses and manuals is made subject to security clearance by the Department of Justice. We have done so for the reason that while on its face this is a proceeding nominally brought on behalf of the public, to have this Court declare certain agreements which are about to expire unlawful and unenforceable, in reality it is a proceeding which will resolve a very important disputed issue of fact summarily, as a matter of law, in favor of the "friend of the Court." As National candidly said when it sought to intervene, "whether the Final Judgment has been violated by ICI (is) an issue which if determined in the Government's favor necessarily disposes of the pending action between ICI and National."

The role played by National in this proceeding is far in excess of the role traditionally played by the friend of the Court, whose presence, it is hoped, will aid the Court in reaching a fully considered decision. Each one of the arguments but one raised by National in its litigation with ICI was the argument made by the Government here. National admits that its position was identical with the Government's in all respects on the law and the facts. This was indeed candid; perhaps it would be more complete to add that each of the Government's arguments was identical to those

first made by National in the suit filed against it.

None of the other licensees sought to intervene or join "National" as amici, or have complained about these allegedly illegal, unlawful provisions. "National" did not enlist the aid of the Government or complain to this Court when it first proposed to license Toyo, but waited until it had been held bound in March 1965 by the consent provisions of the voluntarily made contract.

No explanation has been offered by the Government for its long inaction and sudden interest.

What we have said is not to be taken as any finding or opinion on our part that ICI has a trade secret which it may assert against National. That, as the Court of Appeals pointed out, is an issue which is open for the trier of facts, as is the issue of public domain.

We conclude that there is nothing in the provisions of the Agreements in suit or in the interpretation which ICI has given to them which violate the Final Judgment. The motion is in all respects denied; so ordered.