**AUTOMATED SYSTEMS, INC., a Corporation, Appellant,**

v.

**The SERVICE BUREAU CORPORATION, a Corporation, Appellee.**

**No. 9344.**

United States Court of Appeals Tenth Circuit.

Oct. 9, 1968.

Robert Martin, Wichita, Kan. (George B. Collins, K. W. Pringle, Jr., W. F.

**620**

Schell, Robert M. Collins, W. L. Oliver, Jr., W. V. Crank, and Tom C. Triplett, Wichita, Kan., Thomas M. Burns and Peter J. Wall, Denver, Colo., Phil A. Koury, Kansas City, Mo., on the brief), for appellant.

Douglas Stripp, Kansas City, Mo. (Blake A. Williamson, Kansas City, Kan., Landon H. Rowland, and James F. Duncan, Kansas City, Mo., Williamson, Cubbison & Hardy, Kansas City, Kan., and Watson, Ess, Marshall & Enggas, Kansas City, Mo., of counsel, on the brief), for appellee.

Before MARVIN JONES *, Senior Judge, United States Court of Claims, SETH, and HICKEY, Circuit Judges.

SETH, Circuit Judge.

Appellant commenced this action seeking relief by way of a constructive trust and for an accounting of profits. The cause of action alleged in the complaint arose from asserted wrongful use of trade secrets and of business opportunity. The plaintiff was denied relief by the trial court sitting without a jury, and this appeal has been taken. The facts are involved, and a somewhat lengthy reference to the trial court's findings is necessary.

The findings of fact made by the trial court are not challenged by either party in this appeal. Appellant urges however that the trial court incorrectly applied the legal doctrines relating to fiduciary obligations arising between a principal and an agent, and erroneously applied the rules relating to trade secrets and business opportunities. The formal contract between the parties and around which this action revolves provides that the law of New York shall apply.

The findings of the trial court show that Gerald H. Oppenheimer was engaged in the business of distributing automobile parts, and in connection with this business he had used and developed a system for inventory control and reporting which utilized data processing equipment and more particularly International Business Machine punched cards. Mr. Oppenheimer by 1959 had installed twenty-five such systems in automobile dealerships which he served. He later organized the plaintiff corporation for the purpose of developing and marketing the inventory control system which he named Roampit.

The defendant corporation is a wholly owned subsidiary of International Business Machines Corporation, and is engaged in the business of processing IBM punched cards, and in developing and designing systems utilizing data processing equipment. The defendant through the processing of cards derived by plaintiff from his dealers learned of the application of the system to automobile parts distributors. Thereafter the parties discussed the possibility of entering into an agreement whereby the defendant would sell to other auto dealers the system that the plaintiff had developed.

To this end the parties entered into a sales contract which provided that the defendant would have a certain period of time which was described as the "test-sell period" during which it could observe the success of the sales campaign to be undertaken and to decide whether or not " * * .* in its sole discretion whether [it] is satisfied as to the quality, reliability and marketability of the system." The defendant reserved the right at the end of the test-sell period (a period of four months) to terminate the agreement by written notice or to expand the agreement through negotiation. The trial court found that the contract was intended to enable the parties " * * * to determine, on the basis of the experience gained through a 'test-sell' program, whether they desired to enter into a more permanent relationship."

Before the defendant executed the contract, it laid down the condition that the inventory control system of the plaintiff

be "frozen." By this it was meant that the particular system, in its then state of development, would be settled upon and this would be the one system which all of the salesmen would sell. Upon the execution of the contract, and pursuant thereto, the defendant undertook to sell the system of the plaintiff through the preparation of a manual describing it in detail and through the indoctrination of salesmen and the planning of a sales program. The trial court found that both parties in good faith undertook to perform the sales agreement, and there was no breach by either party. The record shows that the results of the sales program during the test-sell period were disappointing to the defendant, and it refused to extend the test-sell period, and thereafter cancelled the agreement.

The cause of action asserted by the plaintiff is based upon the approval which the defendant individually secured from Chevrolet Motor Company of an inventory control system to be sold by the defendant to Chevrolet dealers. This approval was given after termination of the sales contract above described. The plaintiff asserts that the initial contact between the defendant and the officials of Chevrolet Motor Company was made during the period that the sales agreement between the parties was in effect, and further that the system which was accepted by Chevrolet was based upon trade secrets and information secured by the defendant from the plaintiff during the course of the contract.

The record shows without question, and the trial court found, that the defendant did reach a decision to cancel the contract with plaintiff, and that thereafter, but before cancellation was effective, did make an appointment with officials of the Chevrolet Motor Company for the purpose of discussing the development of an inventory control system for its dealers. The actual meetings with Chevrolet occurred after the termination of the agreement. The record shows that both parties hereto after the termination of the contract demonstrated their respective systems to Chevrolet officials. When defendant made its appointment with the officials of the Chevrolet Motor Company, it advised the plaintiff through Mr. Oppenheimer that such a meeting was to take place, but it did not advise him that the meeting would be on the sole behalf of the defendant and would not be pursuant to the sales agreement. The defendant thereafter had other opportunities to advise Mr. Oppenheimer of the meetings and their purpose but did not do so. The trial court found that the defendant in its failure to advise the plaintiff of the fact that the proposed meetings would be on behalf of defendant alone did not intend to " * * * deceive Oppenheimer, but did not make it clear whether the approach was to be made by SBC in its own behalf or in behalf of plaintiff." The trial court found that Mr. Oppenheimer understood that in the discussions with Chevrolet, defendant would attempt to secure the approval of a system which was the subject of the sales contract or some modification thereof.

Thus the issues concern the effect of the contact with Chevrolet Motor Company by the defendant before the sales contract was terminated, and concern the comparison of the system which the defendant "sold" to Chevrolet as compared to the system which was the subject of the sales contract.

As indicated above, what has been referred to as the sales contract recites among other things that "SBC acting as exclusive agent for ASI during and for the term of this agreement, agrees to sell, install and service ASI's ROAMPIT system * * *." The agreement also recites, " * * * in consideration of SBC's acting as its exclusive agent for the System, ASI agrees * * *." The agreement otherwise provides that the defendant shall have the exclusive right to market and sell the system which was the subject of the contract. The paragraphs of the contract relating to the "test-sell period" give the defendant sole discretion to cancel the agreement if it is not satisfied with the results thereof, and

provided that if it be satisfied that written notice thereof shall be given " * * * and this agreement will continue in accordance with the terms and conditions set forth herein." As mentioned this section also gives the right to negotiate further terms, conditions, expansions, and modifications. The agreement as to the basic term provided for a three-year period commencing October 1st, which was likewise the commencement of the four-month test-sell period.

The trial court found that during the course of the test-sell period certain modifications in the initial system which was the subject of the contract were sought by the plaintiff, and were in fact made in at least one installation. It was apparent that the system as originally devised was not being successfully sold to the dealers. Plaintiff suggested a modified system and requested an extention of the test-sell period, but the defendant refused to do so and shortly thereafter sent its notice of termination pursuant to the contract.

During the test-sell period it also became apparent that the dealers were not anxious to utilize such a system unless the parts division of the various motor companies whose cars they handled agreed that such a system was suitable. At one time at least during the test-sell period, plaintiff suggested that it would be necessary to secure approval of the parts officials of Chevrolet Motor Company before the Chevrolet dealers could be successfully sold. The trial court also found that the defendant or its predecessor and parent corporation had upon several occasions in previous years at the request of Chevrolet discussed with its officials various systems for inventory control in their dealerships, and had made several specific proposals, none of which were successful.

The record and the findings of the trial court demonstrate that plaintiff before entering into the contract with defendant had installed his system in a number of dealerships, and that it or Mr. Oppenheimer had demonstrated and sought to sell the system to others. Thus the system of the plaintiff at the outset of the test-sell period was quite well known and established. The trial court found this system as it then existed was the subject of the sales contract. The trial court also found that the modified system as proposed by the plaintiff towards the end of the test-sell period represented a substantial change from the one which existed at the outset of the agreement.

The trial court further found that the arrangement that defendant made with Chevrolet Motor Company for a meeting, which arrangement was made during the test-sell period, was for the purpose of ascertaining the requirements of Chevrolet, and to design a system which would meet such requirements. The trial court further found that if such requirements involved the use of a system designed by plaintiff, defendant intended to ask plaintiff to participate. When the meeting was had between defendant and Chevrolet Motor Company, it appeared that Chevrolet desired the defendant to design a system for it, and an employee of defendant by the name of Miniter was brought in to design a system, which he ultimately did, and with some additional modifications it was approved by Chevrolet. This employee was the same person that the defendant had sent to the plaintiff at the outset of the contractual period to prepare the manual which would serve as a basis for the sales effort, and was a person who was then experienced in programming but who had no experience in the automobile parts business. During the course of the sales contract, this employee received intensive indoctrination in the general business of automobile parts distribution through discussions and conferences with the employees of the plaintiff and through his examination of parts departments in a number of dealerships.

The trial court found that the initial system which was the subject of the contract was composed of a number of elements which were then generally known and in use in various automated systems in other businesses. These

included the method of initiating the data as well as subsequent processing and preparation of reports. The court also found that the system the defendant "sold" to Chevrolet was likewise composed of generally utilized elements and based on established methods.

The system of the plaintiff in the various dealerships used what was called a "tub file," wherein individual IBM cards were arranged with each card representing a particular part then on hand. As parts were removed from stock the cards were manipulated and processed, thereby developing the data for reordering and inventory control. It later developed that Chevrolet was opposed to the use of tub files in dealerships and had some previous experience with them. The subsequent demonstration by plaintiff of its system to Chevrolet which incorporated tub files was unsuccessful. The system as developed by the defendant following the termination of the contract utilized a method whereby an adding machine was used to punch a tape to initiate the information for the automatic machines, rather than through the use of a tub file. There were other variations between the two systems which related to subsequent processing and preparation of reports which were not of great significance. The trial court found that plaintiff at one time had recommended against the utilization of the adding machine tape system during the course of the contract.

We agree with the disposition of the case as made by the trial court. Its findings lead us to the same conclusion which was reached by the trial court. The trial court decided that there were no trade secrets involved in the case which defendant could have wrongfully utilized. It concluded that the test-sell period terminated and the arrangement did not mature into a continuing contract. The trial court in effect also concluded that Chevrolet Motor Company was no more a customer or a business opportunity of the plaintiff than it was of the defendant, and that there was no breach of duty by the defendant.

As described above, the principal basis for the claim of the plaintiff relates to the appointment which the defendant made during the course of the contract to meet with Chevrolet officials. This contact on first examination appears to be a serious breach of duty; however, when it is examined closely and when the findings of the trial court are considered, it is apparent that the appointment was not to sell Chevrolet anything that had been handled during the test-sell period, but that the appointment was made for the purpose of discussing the design and formulation of a system which would meet Chevrolet's requirements. Thus the record clearly supports the conclusion that the contact with Chevrolet was to begin discussions with a view to designing a system. As the trial court further found, the defendant intended to design a system, but if the requirements of Chevrolet would necessitate the utilization of the contract system, it intended to bring the plaintiff back into the picture. The defendant put its staff to work out a system which would meet the needs of Chevrolet and one was devised after several months. The court further found that the system as sold to Chevrolet by defendant was substantially different from the one which was the subject of the agreement.

One of the problems in an analysis of the record in this case is that attempts were made during the course of the test-sell period to modify the system as further experience was gained with various dealerships; however, it is clear that the contract did not contemplate the joint development of an inventory control system, but instead was only a sales contract for the sale of a particular system then in existence. The record shows that this particular system, as it existed initially, was not successfully sold, and the arrangement was terminated. The trial court found that the defendant had performed the contract. The contract provided that in the event the design of a "system control device" was necessary, a consulting arrangment would be entered into. A consulting

agreement was discussed with Mr. Oppenheimer of plaintiff corporation near the end of the test-sell period, but no agreement was reached. The trial court found, as above described, that the ASI system as finally developed by plaintiff " * * * was a major modification not in the contemplation of plaintiff and defendant when Exhibit 30 [the contract] was executed."

The arguments of the plaintiff in its brief seem in part to be based on the assumption that the contract was for the development of a system and certain obligations thereby arose. This however is not in accordance with the record. The contract was for the sale of the Roampit system to automobile dealers. This was undertaken, the contract was performed, as the trial court found, and was terminated.

The system which defendant "sold" to Chevrolet was quite a different one than the Roampit system of plaintiff which had elements not acceptable to Chevrolet. After the contract ended, plaintiff also demonstrated his development of the Roampit system to Chevrolet, but was not successful. The system endorsed by Chevrolet was different in its essentials from the one that had been the subject of the sales contract between the parties. Chevrolet was not a customer or opportunity of either party during the contract nor of the sales effort undertaken under the contract. Thus there was no breach of fiduciary duty by defendant.

On the issue raised by plaintiff relative to the appropriation of trade secrets, it urges that several New York cases establish the doctrine relating to trade secrets which was ignored by the trial court. These cases upon which reliance is placed include Franke v. Wiltschek, 209 F.2d 493 (2d Cir.); Walters v. Shari Music Publishing Corp., 185 F.Supp. 408 (S.D.N.Y.); Fairchild Engine & Airplane Corp. v. Cox, Sup., 50 N.Y.S.2d 643; Imperial Chemical Industries Ltd. v. National Distillers & Chemical Corp., 342 F.2d 737 (2d Cir.). The cases are significant but the findings of fact made by the trial court do not permit the conclusion that the New York elements of a "trade secret" were established.

The cited case of Walters v. Shari Music Publishing Corp., supra, is important in its development of the doctrine that the "secret" used need not be really a secret. Instead it may be knowledge which perhaps is somewhat obscure, but in any event, has been obtained, developed, or amassed by plaintiff through some considerable effort and expense. If this information learned by defendant while in some fiduciary or employment relationship is then utilized by him in direct competition with plaintiff, a duty is violated. The cited case concerned the use of a musical composition not secret but which was part of certain obscure folk music. Also the case of Franke v. Wiltschek, 209 F.2d 493 (2d Cir.), concerned a manufacturing process not patentable and not completely unknown because it was described in available literature, but "borrowed" in its developed form by the defendants while in a fiduciary relationship with the plaintiff. In the case at bar the findings do not establish that there was such a developed package of information or technique which was acquired by defendant or used by it individually. There is no showing that plaintiff had developed any such information within the issue here which comes within the New York definition of a trade secret. It is by no means comparable with Fairchild Engine & Airplane Corp. v. Cox, Sup., 50 N.Y.S. 2d 643, upon which plaintiff places reliance. The cited case concerned a switch of employment by an employee with complete knowledge of a particular and narrow technique. There certainly can be no quarrel with the case, but it is not applicable to the facts developed here. The same may be said of Seismograph Service Corp. v. Offshore Raydist, 135 F.Supp. 342 (E.D.La.), cited by plaintiff as an outstanding case from another jurisdiction.

Plaintiff has pointed out no particular technique nor combination of known elements which would constitute a trade secret. It is obvious that not everything that was used and learned by the defendant and its employees during the course of the contract would constitute trade secrets. The trial court's findings above quoted and other related findings lead it to its conclusions of law that the defendant, in its dealings with Chevrolet Motor Company, made no use of trade secrets or confidential matters acquired while acting as agent for the plaintiff.

The court also concluded that defendant was entitled, after termination of the contract, to use general information gained through its association with the plaintiff. It is apparent from the record that there was an exchange of information between the parties during the course of the contract, especially in relation to the action of the defendant's employee Miniter. This man had wide experience in data processing and system analysis, but he was not acquainted with the automobile parts business. Through his working with the plaintiff's representatives pursuant to the contract, he prepared a manual describing the initial system and which was used as a basis of the first effort. He was further exposed to methods used in the dealership parts departments and in the parts distribution by his examination of various dealerships. Thus he did acquire experience in the automobile parts business which constitutes the "general information" referred to by the trial court. The fact that the employee became educated in the automobile parts business and thereafter worked in the preparation of the system which was later approved by Chevrolet does not constitute a violation of the doctrine of trade secrets under the New York cases above described nor under any other doctrine.

■ After the relationship established by the sales contract was terminated, and absent any misuse of trade secrets, the defendant could certainly engage in the same general business as the plaintiff was engaged in. Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614 (2d Cir.); State Export Co. v. Mol Shipping & Trading, Sup., 155 N.Y.S.2d 188; American Machine & Metals v. De Bothezat Impeller Co., 82 F.Supp. 556 (S.D.N.Y.).

The plaintiff also strongly urges that the defendant failed to disclose information which it should have disclosed as an agent under the sales contract. This information upon which this issue is raised was the aversion of the Chevrolet official in charge of parts distribution to the use of tub files in the dealer's parts departments by reason of the cumbersome nature of such files and the large amount of space required. From the record it appears that this dislike for the tub files was discovered by the defendant some time in March 1960. This information was not communicated by the defendant to the plaintiff until some time in June of the same year. In May the plaintiff's officer Oppenheimer made the presentation of his plan to Chevrolet, but it was rejected as being too complicated by reason of the large number of cards required and the space taken by the tub files. This information relating to the preference of Chevrolet was thus obtained by the defendant in March 1960; however, the contract between the parties had been terminated by letter dated January 28, 1960, effective February 1, 1960. The information about which the plaintiff complained was in fact something that was obtained following the conclusion of the contract and during the time when both parties were separately demonstrating and negotiating with Chevrolet for approval. Thus this information cannot be used as a basis for plaintiff's complaint of a breach of fiduciary duty.

We find no other acts from the record nor from the findings of the trial court that anything can be established which would show a breach of fiduciary duty occurring during the course of the contractual relationship, or a basis for any other cause of action alleged.

Affirmed.