CAUDILL SEED AND WAREHOUSE
COMPANY, INC., Plaintiff

v.

JARROW FORMULAS,
INC., Defendant

v.

C.S. Health, LLC, Third-
Party Defendant

CIVIL ACTION NO. 3:13-CV-00082-CRS

United States District Court,
W.D. Kentucky,
at Louisville.

Signed October 28, 2015

Filed 10/29/2015

Ann G. Schoen, Frost Brown Todd LLC, Cincinnati, OH, Stephen Beville Pence, Pence & Ogburn, PLLC, Cory J. Skolnick, D. Patton Pelfrey, Junis L. Baldon, Thomas C. Gleason, Thomas Patrick O'Brien, III, Frost Brown Todd LLC, Louisville, KY, for Plaintiff.

Eric E. Grondahl, Mark D. Giarratana, Thomas J. Rechen, McCarter & English, LLP, Hartford, CT, Jamie K. Neal, Joel T. Beres, Stites & Harbison, PLLC, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

CHARLES R. SIMPSON III, SR., JUDGE, UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF KENTUCKY

Broccoli has long been considered a side-dish, an afterthought to the entree. But in this case, broccoli—or, more specifically, broccoli seeds-is the main course. For several years, Jarrow Formulas, Inc., a maker of nutritional supplements, purchased broccoli seed extract from Caudill Seed and Warehouse Company, Inc. for use in Jarrow Formulas' products. Then, Jarrow Formulas hired away one of Caudill Seed's employees. Caudill Seed feared that the employee took trade secrets with him, so it has sued Jarrow Formulas to protect those alleged trade secrets. In turn, Jarrow Formulas suspected Caudill Seed was sending it an adulterated product and cross-sued. Competing motions for summary judgment have cropped up, and now those motions are ripe for review. For the reasons that follow, the Court will grant Caudill Seed's Motion for Summary Judgment on Jarrow Formulas' counterclaims in full, and it will deny Jarrow Formulas' Motion for Summary Judgment on Caudill Seed's claims.

## I. Background

Motions for summary judgment require the Court to view the facts in the light most favorable to the non-moving party and to draw all reasonable inferences in that party's favor. *See Bender v. Southland Corp,* 749 F.2d 1205, 1210–11 (6th Cir.1984). This is a case that presents competing motions for summary judgment. As such, the following factual background presents the facts in the light most favorable to Caudill Seed when discussing the misappropriation of trade secrets and, when discussing the irradiation of broccoli seeds sold to Jarrow Formulas, recites the facts in the most favorable light to Jarrow Formulas.

### A. Trade Secrets

Caudill Seed is a seed distribution company. It also uses its seeds to develop nutritional supplements, foods, and cosmetic products. Jarrow Formulas primarily produces nutritional supplements. At one time, Jarrow Formulas was one of Caudill Seed's largest customers. Jarrow Formulas would buy bulk quantities of supplement ingredients from Caudill Seed and others, manufacture the supplements, bottle them, and then sell them to consumers.

This dispute grew out of the sale of nutritional supplements containing the chemical glucoraphanin, Glucoraphanin occurs naturally in broccoli seeds, The consumption of glucoraphanin may have positive health effects in humans. One of Caudill Seed's products is "broccoli seed extract," which contains high concentrations of glucoraphanin; Caudill Seed has made glucoraphanin products for more than a decade. Caudill Seed markets its broccoli seed extract under the trademark "BroccoRaphanin." Prior to August 2011, Jarrow Formulas purchased BroccoRaphanin, and it used the product in several of the supplements it sold to consumers, including the supplement "BroccoMax." But since it hired Kean Ashurst,[1]

---

1. Ashurst has worked in the food industry for many years. From 2002 to 2011, he worked for Caudill Seed as a researcher and nutritional supplement formulator. His work focused on broccoli-based supplements. At Caudill Seed, be had access to all of the com-

a former employee of Caudill Seed, Jarrow Formulas has internally produced broccoli seed extract for use in BroccoMax and other products.

The year 2011 brought important changes for both companies beyond Ashurst's horse-trading That year, scientific publications indicated that Jarrow Formulas' glucoraphanin-based products did not effectively release in human bodies. Jarrow Formulas became fearful that the studies would hurt its sales. It began experimenting with "activated" formulas for glucoraphanin; Caudill Seed had been experimenting with activated formulas for at least three years prior. The companies call it "activated" because the new processes focused on the preservation and utilization of the enzyme, myrosinase, to increase glucoraphanin's efficacy. Before he left Caudill Seed, Ashurst told his employer that Caudill Seed's activated product was nearly ready for commercialization—Caudill Seed began contacting production facilities in anticipation. Meanwhile, prior to hiring Ashurst, Jarrow Formulas had conducted no research on any broccoli seed ingredients, including an activated formula. Nevertheless, in Ashurst's own words, Jarrow Formulas was trying to "beat [Caudill Seed] to the punch." *See* D.N. 124-12, PageID #4107.

Caudill Seed believes that Jarrow Formulas hired "Ashurst as a corporate spy to steal trade secrets while he was still employed at Caudill Seed," D.N. 124-1, PageID # 3971. As early as 2010, Ashurst had told Caudill Seed clients that he was planning to leave Caudill Seed. And as late as March 2011, Ashurst met privately with Jarrow Rogovin, Jarrow Formula's president and chairman. One of Ashurst's duties at Caudill Seed was to communicate with Jarrow Formulas, which, after all, was one of Caudill Seed's biggest clients. But Ashurst instructed Jarrow Formulas to only email him on his personal account, not on his Caudill Seed work account. From April to May 2011. Ashurst sent Rogovin a series of emails containing what he identified as Caudill Seed's confidential information. As well. Caudill Seed alleges that Ashurst took with him a research notebook and a hard drive that contained research, formulas, and processes. Jarrow Formulas and Ashurst staunchly deny the allegations concerning the hard drive and notebook. Caudill Seed also claims that Ashurst knew Caudill Seed needed these materials for an upcoming industry conference and to secure two new accounts. Jarrow Formulas apparently did make informational requests of Ashurst: In April 2011, for example, Dallas Clouatre, a scientific consultant for Jarrow Formulas, asked Ashurst for Caudill Seed's research on BroccoMax [2] and "broccoli actives."[3] D.N. 124-26. Ashurst signed his agreement to work for Jarrow Formulas the day before he resigned from Caudill Seed; the day lie signed, he also began compiling data—including Caudill Seed's customer

---

pany's research findings, processes, and broccoli supplement formulas. He left Caudill Seed in May 2011. He had signed a consulting agreement with Jarrow Formulas the day before he quit at Caudill Seed, and he began work with Jarrow Formulas two days after quitting. He still works for Jarrow Formulas as a consultant.

**2.** Caudill Seed's glucoraphanin product was BroccoRaphanin. Jarrow Formula's nutritional supplement in which it utilized BroccoRa-

phanin was BroccoMax. The email used the term "BroccoMax," but presumably was referring to BroccoRaphanin, as Clouatre was seeking Caudill Seed's research file.

**3.** As with many factual points that Caudill Seed believes demonstrate nefarious intent Jarrow Formulas swipes this away and claims it was taken out of context. Its explanation is that Clouatre was making product literature for Jarrow Formulas and merely wanted to cite the requested research.

lists, summaries of product development plans, and production costs—that he then forwarded to Rogovin's secretary with instructions to pass it to Rogovin directly.

Shortly after joining Jarrow Formulas, Ashurst finished the activated broccoli seed project he was hired for. In September, 2011, Jarrow Formulas began commercial production with a single 200 kilo batch at Valensa International, a manufacturing facility in Florida. A 2,000 kilo batch was produced in January, 2012. Jarrow Formulas claims that Ashurst developed the process while at Valensa, but Valensa's representatives have testified that Ashurst already knew the processing parameters he wanted for glucoraphanin before he arrived. Caudill Seed believes that Ashurst used the same activated glucoraphanin process that he began working on while at Caudill Seed. Within a year of Ashurst's arrival, Jarrow Formulas applied for a provisional patent.

Caudill Seed identified its trade secrets which it claims were misappropriated as follows:

1. Research and development on supplements, broccoli, and chemical compounds;
2. The general manufacturing process detailed in Caudill Seed's provisional patent application;
3. The precise process for spray-drying myrosinase;
4. Vendor information for Caudill Seed's glucoraphanin and activated products;
5. Customer pricing and sales information; and
6. The hard drive and research notebook described above.

Jarrow Formulas' main response to all this is that its process is actually dissimilar to Caudill Seed's. Whereas Caudill Seed's process is to extract myrosinase from broccoli seeds in water then spray-dry the extract to make powdered myrosi-

nase before adding the myrosinase to glucoraphanin, Jarrow Formulas does not extract myrosinase from broccoli at all. Rather Jarrow Formulas heats broccoli powder at temperatures that do not deactivate the myrosinase in the first place, Given these differences, and the U.S. Patent Office's approval of Jarrow Formulas' patent application, Jarrow Formulas believes its process is novel and denies any reliance on Caudill Seed trade secrets.

Jarrow Formulas also disputes that there is any direct evidence that Ashurst took the research notebook or the hard drive, or that they contain any trade secrets. The circumstantial evidence is that Caudill Seed has been unable to find them since Ashurst left. But no concrete evidence of his responsibility exists, and Ashurst said during state court proceedings that he did not take them. During discovery, Caudill Seed never asked Jarrow Formulas witnesses about the notebook or hard drive. Caudill Seed deposed Ashurst twice in this case, and it never asked him about either item, However, Caudill Seed cites testimony of Putnam, Sullivan, and Dan. Caudill, all of Caudill Seed, who identify a red external hard drive and corn position-type notebook that contained Caudill Seed's test results, data, formulas, protocols, processes and other R & D materials. There is testimony that the hard drive and notebook were always in Ashurst's possession and that he maintained the confidentiality of the information they contained. There is testimony that Ashurst took these items with him when he left the premises or that he locked them in the lab or his office. These individuals searched for the hard drive and notebook, but they were not found. Caudill testified that he saw the notebook (the "formula book") in Ashurst's possession in May, 2011 shortly before Ashurst went to FONA, a subcontractor who Caudill Seed intended to utilize to scale up its production of myrosi-

nase., then went to Jarrow Formulas and signed a consulting agreement, and re-signed from Caudill Seed the following Monday. The hard drive and notebook were not found at Caudill Seed thereafter.

Finally, Jarrow Formulas disputes that Caudill Seed has alleged any actual trade secrets, relying principally on the opinion of its expert, Dr. Leslie West. Dr. West who opines that (1) the process for producing deoiled broccoli seed powder by supercritical fluid extraction using carbon dioxide as a solvent, (2) the process for water extraction of myrosinase from broccoli and spray drying the extract to obtain myrosinase powder, (3) the concept of formulating nutritional supplements containing glucoraphanin, myrosinase, and ascorbic acid to catalyze the reaction between myrosinase and glucoraphanin, and (4) the process for producing sulforaphane from glucoraphanin using myrosinase were known or readily ascertainable by proper means based on information in the public domain. In Caudill Seed's response, it notes a distinction between patentability and trade secret protection, and urges that its discoveries and development of the processes identified in its provisional patent application and research materials constitute protectable trade secrets. This distinction is discussed later in this opinion.

Caudill Seed initially filed suit in May 2011 in Jefferson Circuit Court. Ashurst was the sole defendant, and Caudill Seed's claims included breach of contract, breach of fiduciary duty, breach of duties of good faith and loyalty, misappropriation of trade secrets in violation of Kentucky law, common law trade secret misappropriation, and conversion. The state court litigation lasted for almost three years: it ended when Caudill Seed voluntarily dismissed the case with prejudice in January 2014. The proceedings in this Court began in 2013.

## B. Irradiated Broccoli Seeds

Jarrow Formulas filed counterclaims in this action in August 2013. It asserted eight claims: (1) fraudulent inducement; (2) California statutory unfair competition; (3) negligence per se; (4) breach of contract; (5) breach of implied warranties; (6) tortious interference; (7) declaratory judgment; and (8) Lanham Act false advertising. See D.N. 21, PageID # 209-17. The counterclaims all spring from the irradiation of broccoli seeds—a process where seeds are exposed to radiation for various purposes. Jarrow Formulas claims that federal food and drug regulations prohibit irradiating dietary supplement ingredients. And it contends that irradiating seeds could be unsafe for consumers. Caudill Seed disputes that there is any indication irradiation is unsafe, and it retorts that Jarrow Formulas' claims about regulatory prohibitions are a "gross simplification of a complex regulatory question to which there is currently no clear answer." D.N. 124-1, PageID # 3977.

Jarrow Formulas' version of the events is that in 2011 it became suspicious that Caudill Seed was sending it irradiated products, contrary to the agreement between the two. Jarrow Formulas' purchase orders all stated that the broccoli seed extract it purchased from Caudill Seed should be non-irradiated. Jarrow Formulas' belief is that Caudill Seed sent false certificates of analysis, claiming the seeds were non-irradiated, to pull the wool over Jarrow Formulas' eyes.

In January 2013 Caudill Seed's corporate designee, Joseph Lyons, admitted during his deposition that the Food and Drug Administration's regulations had prohibited the use of irradiation on dietary supplements as a way of reducing "bacterial load" since 2007. D.N. 135-4, PageID # 8147. He also said, though, that Caudill Seed had experimented "[e]arly on" with

irradiation as a way of increasing glucoraphanin count. *Id.* But he stated that Caudill Seed did not irradiate its seeds and, moreover, most of its clients specified that they wanted non-irradiated seeds: as well, he could not name any customer that requested irradiated seeds. *See id.* 8147-48. Indeed, he asserted that, even if a customer asked for irradiated seeds, Caudill Seed would not have sold them "given the limitation that one should not be selling supplements that have been irradiated." *Id.* at 8148. His statements were incorrect. During Caudill Seed's state court proceedings against Ashurst, it came to light that in 2011 Caudill Seed used a third-party vendor to irradiate "multiple lots of BroccoRaphanin, including several lots sent by Lyons himself." D.N. 135, PageID # 7977 (citing D.N. 135-5, PageID # 8158-60). Lot numbers indicate that some of those irradiated lots were indeed sent to Jarrow Formulas. These state court epiphanies were initially under protective order—and thus outside of Jarrow Formulas' view—but ultimately the state court permitted Ashurst to share this evidence with Jarrow Formulas, which he did in October 2013. Jarrow Formulas' suspicions were finally confirmed.[4] In the following months, Caudill Seed was held in contempt, sanctioned, changed counsel for a second time, and dismissed its case against Ashurst as discussed in the previous section.

In January 2014—the same month the state court proceeding was dismissed—Dan Caudill, the corporate representative

for C.S. Health, a subsidiary of Caudill Seed, admitted that Caudill Seed had irradiated its broccoli seeds after 2007. His explanation was that Caudill Seed's counsel on FDA matters had opined dial Caudill Seed could legally irradiate its seeds. As Jarrow Formulas has pointed out, though, there are inconsistencies here. For example, Ashurst's replacement at Caudill Seed, Darrell Smith, said during his deposition that, around the time he began in Ashurst's position in early 2012, Dan Caudill told him during a meeting—where Lyons was also present—that Caudill Seed's FDA lawyer had advised it not to "[irradiate the seeds] anymore, period." D.N. 135-8. PageID # 8301. During a hearing presided over by the late Senior Judge John G. Heyburn II, Caudill Seed foreswore using advice of counsel as an affirmative defense. *See* D.N. 94, PageID # 3526-32.

After providing some excuses for the irradiation that turned out to be untrue,[5] Caudill Seed retreated to the position that Ashurst was the only one to irradiate the seeds and that he kept his practices from Caudill Seed. Jarrow Formulas believes this position is also without merit because: (1) Dan Caudill admitted to the irradiation; (2) Ashurst has testified that he only irradiated the seeds because Dan Caudill told him to; (3) when Ashurst left, Dan Caudill told other employees to "replicate what Kean had done"; and (4) Caudill Seed kept irradiating and sending irradiated prod

---

**4.** Here, too, the parties' stories diverge greatly Jarrow Formulas maintains that October 2013 was the first time it knew with certainty that it had been sold irradiated seeds. But Caudill Seed notes in briefing that Ashurst had been with Jarrow Formulas before then—and, as discussed later, Ashurst apparently knew of the irradiation—and so contends that Jarrow Formulas must have known sooner. In fact, Jarrow Formulas filed its counterclaims two months before it became privy to the

state court discovery, and it had also acknowledged in filings *before* the counterclaim that it knew of the irradiation. *See* D.N. 124-1, PageID # 3980.

**5.** For example, Dan Caudill at one point claimed that no lots were completely irradiated and that any tots that did contain irradiated seeds were clearly marked with stickers on the shipping packages, Jarrow Formulas disproved these claims during discovery.

ucts to Jarrow Formulas even after Ashurst resigned D.N. 135, PageID # 7980-81.

Caudill Seed is quick to note that Ashurst was originally the one irradiating and sending irradiated seeds to Jarrow Formulas, and he was the one who signed the certificates of analysis that indicated the seeds were non-irradiated. During his deposition, Rogovin conceded that he was "suspicious" that Caudill Seed had sent him irradiated products because of conversations he had with Ashurst in early-to-mid May 2011. D.N. 124-4, PageID # 4046. In fact, in July 2011 Ashurst sent documents to Rogovin with highlights and arrows that Ashurst had drawn pointing to proof that Caudill Seed had sent Jarrow Formulas irradiated product.[6] *See* D.N. 124-5, PageID # 4051-53. So Caudill Seed contends that, even though Jarrow Formulas was suspicious, Jarrow Formulas continued to purchase BroccoRaphanin from Caudill Seed and kept selling BroccoMax and other BroccoRaphanin-based products to consumers.[7] Moreover, even after it learned that it sold supplements made from irradiated seeds, Jarrow Formulas never recalled the supplements. Jarrow Formulas' recall policies even require it to recall products that do not conform to FDA regulations, and, of course, Jarrow Formulas' counterclaims depend largely on whether the seeds it bought from Caudill Seed conformed to federal regulations. Given all this, Caudill Seed argues that purchasing irradiated seeds never harmed Jarrow Formulas. And Caudill Seed believes that, because all of Jarrow Formulas' claims require proof of injury, Jarrow

Formulas' counterclaims must be denied on summary judgment.

### III. Standard

To grant a motion for summary judgment, the Court must determine that no genuine dispute as to any material fact exists, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of identifying the basis for its motion and the parts of the record demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This Court must decide whether the evidence demonstrates "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir.1993) (internal quotations omitted; citation omitted).

### IV. Discussion

#### A. Caudill Seed's Claims

Caudill Seed identified its trade secrets which it alleges were misappropriated as follows: (1) research and development on supplements, broccoli, and chemical compounds; (2) the general manufacturing process detailed in Caudill Seed's provisional patent application; (3) the precise process for spray-drying myrosinase; (4) vendor information for Caudill Seed's glucoraphanin and activated products; (5) customer pricing and sales information; and (6) the hard drive and research notebook as described herein. Jarrow Formulas seeks

---

**6.** Even if Ashurst had not given proof, Caudill Seed posits that Jarrow Formulas had enough information to determine on its own that irradiation had happened. Jarrow Formulas' experts said during deposition that there were ways to test for irradiation. Nothing in the record indicates any tests were done. Caudill Seed feels that if Jarrow Formulas really was

worried about irradiation, it could have tested the products it bought from Caudill Seed.

**7.** Indeed, it appears that Jarrow Formulas purchased 775 kilograms, roughly 1,700 pounds, of irradiated broccoli seed from Caudill Seed and used all but the last five pounds. D.N. 91, PageID # 3480; D.N. 124-1, PageID # 3982.

summary judgment with respect to each aspect of trade secret evidence offered by Caudill Seed. Jarrow Formulas attacks the evidence in a number of ways. Its complaints include untimely disclosure and lack of particularity with which Caudill Seed has described its trade secrets.

### i. Jarrow Formulas' Arguments Concerning Late Disclosure

■ As hinted above, Jarrow Formulas requests summary judgment on Caudill Seed's second through fifth trade secrets because it contends those alleged secrets were not timely disclosed. Jarrow Formulas argues that, in response to its interrogatories, Caudill Seed gave a vague answer that identified only research and formulas, information in "certain patent applications," and a customer list. D.N. 139, PageID # 9149. And Jarrow Formulas asserts that Caudill Seed failed to properly supplement its answers. It claims that the proper penalty for Caudill Seed's failings is " 'automatic and mandatory exclusion" of any evidence relating to these claims and thus summary judgment on them. D.N. 139, PageID #9150 (quoting *Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir.2003)). It laments that it "pressed" Caudill Seed to identify all of its trade secrets, that Caudill Seed failed to do so until briefing on this motion, and that allowing the second through fifth trade secrets to proceed would prejudice Jarrow Formulas because it would be required to defend against alleged trade secret claims it has not been allowed to develop a factual record on. D.N. 139, PageID #9151.

Jarrow Formulas' complaints are too technical. As the case law Jarrow Formulas relies on suggests, the requirements of supplementing discovery under Federal Rule of Civil Procedure 37 are to "prevent . . . 'sandbagging' an opposing party with new evidence" and to avoid forcing a defendant to challenge newly alleged trade secrets without a factual record. D.N. 139, PageID #9151 (quoting *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607 (S.D.N.Y. 2004)); (citing *TNS Media Res., LLC v. TRA Global, Inc.*, 977 F.Supp.2d 281, 313 (S.D.N.Y.2013)). But briefings from both sides demonstrate that the record includes evidence relating to each of the six trade secrets Caudill Seed enumerated in briefing. Jarrow Formulas may not approve of Caudill Seed's specificity in identifying the trade secrets, but it cannot be said that Jarrow Formulas would be prejudiced, because there is a factual record that Jarrow Formulas can use in its defense. This reason alone, then, is not enough for summary judgment.

### ii. The Hard Drive and Research Notebook

■ Jarrow Formulas' motion for summary judgment regarding the hard drive and the research notebook will be denied. Jarrow Formulas contends that it is fatal to the misappropriation claim that Caudill Seed is unable to prove that the hard drive and notebook ended up in the hands of anyone at Jarrow Formulas. The evidence that links the lost hard drive and notebook to Jarrow Formulas is admittedly purely circumstantial. The evidence that suggests a theft of these items from Caudill Seed consists of testimony from Caudill Seed's people that the hard drive and notebook went missing the day Ashurst left employment. *See* D.N. 126-1. PageID # 5372. Caudill Seed states that it has searched repeatedly, and thoroughly, for the items to no avail. D.N. 133, PageID # 6794. Given this circumstantial evidence. Caudill Seed believes that a "jury should reach the reasonable conclusion that Jarrow Formulas received the contents of the hard drive, especially in light of clear evidence that Jarrow Formulas requested and received Caudill Seed's 'full research file' on broccoli seed extract." *Id.*, PageID # 6795.

During the state court proceedings against him, Ashurst denied taking the hard drive and notebook. D.N. 126-1, PageID # 5372. And the state case was voluntarily dismissed with prejudice. *Id.* During his deposition in this case. Dan Caudill admitted there was no direct evidence that Jarrow Formulas received the items. *Id.*, PageID # 5373. He stated, "I don't have a picture of him taking them, OK?" D.N. 133, PageID# 6915. Additionally, Lyons testified that

> There is no question in my mind that Mr. Ashurst maintained both electronic and handwritten files containing formulations and information regarding everything we have discussed [referring to specific research conducted by Caudill Seed, D.N. 133-4, PageID# 6903, 46:10-48:5]. And in fact, upon his departure, those files, specifically a hard drive from his computer, a laboratory notebook into which much of that information had been entered, as well as other notes, disappeared from our property, It—it doesn't take a leap for me to see that inasmuch as he was sharing everything else, that would not have been part of the subject matter at hand ... They rarely left Mr. Ashurst's physical possession. Mr. Ashurst, for example, would be asked a question. He would immediately go to an erasable board, open up his notebook and answer it that way. Mr. Ashurst would be conducting experiments in the laboratory, and as certain steps or procedures were being developed, notes of them were being made extensively in that notebook.

DN 134-4, PageID# 6904. However, Ashurst was deposed twice, and Caudill Seed asked him no questions concerning the items. D.N. 126-1. Moreover. Caudill Seed never asked *any* Jarrow Formulas witnesses about the hard drive or notebook. *Id.*

Were the proof simply that these physical items were there one day and gone the next, a reasonable jury, without more, could not conclude by a preponderance of the evidence that Jarrow Formulas had misappropriated the hard drive or the notebook. But the evidence offered by Caudill Seed against Jarrow Formulas does not focus on the disappearance of These physical items from Caudill Seed's premises alone. Rather. Caudill Seed focuses on the alleged use by Jarrow Formulas of the contents—the purported trade secrets—immediately upon Ashurst's resignation from Caudill Seed. Jarrow Formulas has not disputed that the hard drive and notebook were the primary repositories of Caudill Seed research and development information, nor does it dispute that Ashurst contributed to that preserved information while working at Caudill Seed. Jarrow Formulas urges, however, that Caudill Seed has failed to identify with sufficient specificity the information which was in the notebook and on the hard drive, and therefore urges that Caudill Seed cannot prove that the information constituted trade secrets. For reasons explained in greater detail below, we find that a genuine issue of material fact exists with respect to the claim of misappropriation of trade secrets from the hard drive and notebook.

Ashurst has denied the physical removal of the hard drive and notebook from Caudill Seed's premises, and Caudill Seed has no direct evidence to establish otherwise. In a prior opinion in this case (D.N. 89), Senior Judge Heyburn determined that because these issues had been litigated before in state court with Ashurst as the defendant, the doctrine of *res judicata* could preclude Caudill Seed's claim under Kentucky's Uniform Trade Secrets Act. He decided that "insofar as Jarrow's liability is predicated solely on Ashurst's acts ... Caudill's KUTSA claim is barred [the

claim] is not barred insofar as it is predicated on the independent acts of Jarrow." D.N, 89, PageID # 3456.

Any evidence indicating the hard drive and notebook were stolen implicates Ashurst alone. Thus, as suggested by Judge Heyburn, the alleged theft, an alleged act of misappropriation by Ashurst, has been found to be beyond the reach of this litigation and cannot be imputed to Jarrow Formulas. But that does not end the inquiry with respect to claims based upon Jarrow Formulas' own alleged acts of misappropriation of Caudill Seed trade secrets.

Misappropriation of trade secrets reaches beyond the allegation that Ashurst absconded with a hard drive and notebook. With respect to Jarrow Formulas, we note that:

KRS 365.880(4) defines "trade secret" to mean:

Information, including a formula, pattern, compilation, program, data, device, method, technique, or process that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use: and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

KRS 365.880(2)(b)(2)(c) states:

"Misappropriation" means use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit is use

The definition of "misappropriation" also includes "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." KRS 365.880(2)(a).

Thus, the knowing and unauthorized use of the trade secrets of another can constitute misappropriation under KUTSA.

There is evidence that the notebook kept by Ashurst, and allegedly jealously guarded by him, was a reference notebook or "formula book," as described by Dan Caudill, which contained the essential body of research and development with broccoli seed extract by Caudill Seed. There is sufficient evidence offered for a reasonable jury to conclude that Jarrow Formulas made unauthorized use of this body of information derived from or through Ashurst to rapidly formulate, commercialize and seek a patent on its own activated broccoli seed extract. Thus while a misappropriation claim against Jarrow Formulas cannot be grounded in vicarious liability for Ashurst's alleged theft of the hard drive and notebook, Caudill Seed still remains free to argue that its trade secrets, located on the hard drive and in the notebook and elsewhere, were misappropriated by Jarrow Formulas.

Further, we find that there is sufficient evidence to establish a genuine issue of material fact whether information likely saved on the hard drive and in the notebook constituted trade secrets of Caudill Seed. We develop this issue more thoroughly below.

*iii. The Trade Secrets* [8]

Jarrow Formulas attacks the particular information identified by Caudill Seed as

---

**8.** These are research and development, vendor and customer information, the general

process, and the specific process.

trade secrets, alleging that it failed to describe them with particularity, and that Caudill Seed cannot prove it was harmed. We find that Caudill Seed has described its purported trade secrets with sufficient particularity to overcome summary judgment. We conclude that genuine issues of material fact exist with respect to whether the information so identified constitutes trade secrets, whether Jarrow Formulas made unauthorized use of Caudill's trade secrets, and whether Caudill Seed was injured thereby. A jury should decide these fact-based issues.

As to the particularity argument, Jarrow Formulas relies on case law indicating that plaintiffs must provide enough information on each alleged secret "to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." D.N. 139, PageID # 9151 (quoting *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir.1998)). And it notes that whether a trade secret has been particularly described is a question of law. *See* D.N. 139, PageID #9151.

Caudill Seed has offered evidence that long before its entry into the dietary supplements arena in approximately 2004, it had conducted broccoli seed research which formed the foundation for its development of its BroccoRaphanin product. Lyons opined about its exclusive proprietary and confidential research and formulas regarding the extraction and isolation of certain compounds derived from broccoli seed and sprouts. He referred to the entire body of work over a 17-year period which led to the knowledge which existed and developmental breakthroughs which occurred at Caudill Seed immediately before Ashurst left the company. Ashurst himself was responsible for much of this progress from 2002 to 2011 as the Chief Science Officer in charge of the broccoli seed extract research. The Amended Complaint describes Caudill Seed's scientific development over time:

9. A significant part of Caudill Seed's business and competitive advantage relies upon the research and development of new products related to seed and seed sprout production as well as processes for extracting, isolating and developing compounds from those products including glucoraphanin, the myrosinase enzyme and sulforaphane. Caudill Seed holds and has an interest in numerous patents, pending patents, and provisional patents and owns exclusive confidential and proprietary information related to their agricultural and nutritional supplement products, particularly those related to broccoli seed and sprouts and the development and extraction of certain derivatives and compounds from those seeds and sprouts. Caudill Seed is also sublicensed to numerous John Hopkins' patents through Brassica Protection Products, LLC. Caudill Seed spent several years and millions of dollars developing, improving and marketing substances derived from its extensive research of broccoli seed and sprouts, including glucoraphanin, the myrosinase enzyme and sulforaphane which is widely used in nutritional supplements and cosmetics, Glucoraphanin/sulforaphane contains anticancer and antioxidant properties and is used in nutritional supplements and topical applications.

D.N, 6, PageID# 23. Dan Caudill testified that "we believe that the bulk of the research and development work that had been done at our company, the different laboratories and consultants and so, had been downloaded on that [missing hard drive]...because I had heard Mr. Ashurst refer to that, when we were looking for parts of information." D.N. 133-6, PageID# 7027.

Caudill Seed has more specifically identified its refined process for manufacturing BroccoRaphanin utilizing certain temperatures, pressures, and times, and later, its work in the manufacture of myrosinase, to "stabilize it and utilize[e] that myrosinase to convert glucoraphanin and capture and stabilize the sulforaphane that it had created." Lyons. D.N. 133-5, PageID# 6913; *See* also, Caudill, D.N. 133-5, PageID# 6930. Caudill Seed contends that it later recreated this work, and ultimately produced an activated glucoraphanin product.

There is ample evidence, much of which is admitted by Ashurst and/or Rogovin, that Ashurst was providing confidential information to Jarrow Formulas before he left the company. Caudill Seed has offered evidence that Jarrow Formulas received Caudill Seed's "entire research file" on glucoraphanin, vendor and customer sales data and cost information. There is email correspondence in which, the day before his resignation, Ashurst provided to Jarrow Formulas the entire provisional patent application of Caudill Seed relating to myrosinase production and processes. Ashurst notes that Jarrow Formulas urges through its expert that the various processes identified by Caudill Seed for the production of deoiled broccoli seed powder and for the extraction and spray drying of myrosinase were generally known or readily ascertainable by proper means based upon information in the public domain and therefore could not constitute trade secrets of Caudill Seed. "To qualify as a trade secret, the information must 'derive independent economic value,' not be 'readily ascertainable by proper means,' and be the 'subject of efforts that are reasonable under the circumstances to maintain secrecy.'" *Auto Channel v.*

*Speedvision Network, LLC,* 144 F.Supp.2d 784, 794 (W.D.Ky.2001)(citing KRS 365.880).

Jarrow Formulas urges that the various steps in the process of manufacturing an activated glucoraphanin product were either known in the art, or easily discerned or extrapolated from known practices or existing literature. However, the unique feature of this case is that Jarrow Formulas, a company that, admittedly, had done no research and development on the manufacture of broccoli seed extract and, in fact, had never manufactured such a product before, began commercial production of its own activated glucoraphanin within four months of hiring Ashurst away from Caudill Seed. Ashurst does not deny providing Jarrow Formulas with Caudill Seed's confidential materials while he was still employed at Caudill Seed.[9] He describes his own actions as providing "the road map for producing a BroccoRaphanin ... or a glucoraphanin product." D.N. 133-1, PageID# 6835. He explains that to someone who is familiar in the art with processing oil seeds or someone who is familiar with supercritical extraction "would not have a problem putting it together," *Id.* Rogovin testified, in answer to a question concerning why Ashurst was hired by Jarrow Formulas to do something it claimed to be so apparent and simple:

> Simple is relative ... it's not terribly complex ... to encapsulate nutritional ingredients, but nevertheless to properly run the plant and have someone that's capable of working with many, many different ingredients that have different characteristics, different bulk densities, ... different humidity reactions, and so on. It helps to have somebody who's technical, who's trained, who knows how

---

**9.** He does state that he did not consider himself still an employee of Caudill Seed, as he emailed numerous documents to Jarrow Formulas on May 1st which was a Sunday, and resigned Monday, May 2nd.

to do it ... I mean, it takes a farmer to farm. It doesn't mean he owns farming. I can't farm ... I'm not a fanner. I'm not going to go out with 500,000 acres of wheat. It'd be a mess. There's a lot of— you know, there's a certain amount of technology involved. But it's not—I don't know that it's complicated. It takes a certain amount of knowledge in the art. Now, is that rare? Absolutely not. DN 133-21, PageID# 7085. Rogovin earlier affirmed quite clearly earlier in the same deposition that Jarrow Formulas created its own broccoli seed powder using Ashurst's knowledge and experience and building on it. DN 126-11, PageID# 5754. The rapidity with which Jarrow Formulas achieved commercial production of activated glucoraphanin is evidenced, in part, through the testimony of John Minatelli of Valensa. He indicated that Valensa entered into a confidentiality agreement with Jarrow Formulas in June or July of 2011, and "Dr. Uy worked with Kean [Ashurst] to quickly assess the parameters he had preselected before he came to the site to determine whether or not they were appropriate to provide the product he was interested in postsupercritical fluid extraction." DN 133-8, PageID# 6954. Minatelli confirmed that Ashurst provided all the parameters for the supercritical fluid extraction including time, temperature, pressure, unit volume and preparation, on the very first phone call with Valensa. DN 133-8. PageID# 6955. Ashurst did not leave Caudill Seed until May 2011.

As noted in *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410–411 (6th Cir.2006). a plaintiff may prevail in a trade secrets case without identifying a specific item of information or component that is not publicly known or readily accessible, as it is widely accepted that a trade secret can exist in a combination of characteristics each of which, by itself is in the public domain; that is, a new combination of known steps can be entitled to trade secret

protection. The 6th Circuit court quoted *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir.2001) a case in which the plaintiff was found to have a protectable trade secret in its operations and procedures manual despite the fact that most of its content was publicly available. The court stated:

> In order to be considered a trade secret, a pattern, technique, or process need not reach the level of invention necessary to warrant patent protection. A trade secret can exist in combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.

In *Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp.*, 342 F.2d 737, 743 (2d Cir.1965), the Court of Appeals for the Second Circuit found that

> It is no defense in an action of this kind that the process in question *could have* been developed independently, without resort to information gleaned from the confidential relationship ... 'even if resort to the patterns of the plaintiff was more of a convenience than a necessity, still, if there was a secret, it belonged to him, and the defendant had no right to obtain it by unfair means, or to use it after it was thus obtained.' " (internal citation omitted).

In *Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.*, 297 F.Supp.2d 463, 485 (N.D.N.Y.2003), the court found that the trial and error work by Norbrook Laboratories in developing the *in situ* method for the manufacture of PGP injections was entitled to trade secret protection. The court cited a number of cases in which the trade secret consisted of a process derived from years of trial and error research rather than a finished product, yet found that a trade secret existed due to an in-

vestment of substantial time and money in experimentation with different formulations, and the sum of that work "serve[d] as a guide, charting the way through the many problems and decisions faced in designing ... and developing [the particular technology] [citation omitted]." *Id.* at 485. In particular, the court quoted *Imperial Chemical, supra.*, noting the court's rationale that

Although the components of the [manufacturing process] are available in [literature available to the public], development of the know-how ... to operate a commercial process using such a [component] based upon information in the public domain would have required vast research, at great expense in money and time, plus considerable trial and error over an extended period of time. [I]t was obviously [defendants] purpose to avoid the difficulties and the time and expense that would be required to arrive at a commercially feasible process from a synthesis of the information disclosed in the literature.

*Id. quoting Imperial Chemical* 342 F.2d at 743.

Finally, we note that in *Norbrook* the defendant would not have developed its product or method as readily as it did without the plaintiff's scientist's application of a significant body of knowledge concerning the process which *Norbrook* had developed. *Norbrook*, 297 F.Supp.2d at 487–88. This is the very argument made here by Caudill Seed. Indeed, West reviewed the specific details of the Caudill Seed process which Ashurst had provided to Caudill Seed's manufacturing vendor, FONA, and noted that the content "contained steps in a process, and they were very well-defined steps which talk about temperatures, quantities of material, volumes of extracting material. There was even reference to specific types of equipment that one would use. It was set up very much as a procedure to be followed ... almost like a cook-

book, if you will." DN 133-61, PageID# 7502-7503.

■ Additionally, Caudill Seed alleges that Ashurst had access to and knowledge of the vendors used and the costs of manufacture as well as customer lists and pricing for its product. Knowledge of vendors and their capabilities as well as pricing can be a trade secret even if the information can be obtained through public means as long as the information is not readily available. *Giasson Aerospace Science, Inc. v. RCO Engineering, Inc.*, 680 F.Supp.2d 830, 843 (E.D.Mich.2010).

Caudill Seed contends that the conglomeration of general processes identified in its provisional patent application which Ashurst admittedly provided to Jarrow Formulas prior to its publication, the specific process (its "cookbook") for manufacturing activated glucoraphanin, as well as its body of research from which its processes were developed, its vendor lists and costs and customer lists and pricing constituted trade secrets which enabled Jarrow Formulas to manufacture and bring to market its activated glucoraphanin product in mere months.

Jarrow Products contends that Caudill Seed's processes were unnecessary to its work and it did not rely on them in establishing its own processes. It contends that its product differs in significant respects from Caudill Seed's, as Caudill Seed's process for achieving activated glucoraphanin was allegedly unsuccessful, and took a direction which was abandoned by Ashurst for another unique process. These, and other assertions by Jarrow Formulas illustrate the genuine issues of material fact which exist in this case.

■ We conclude that Caudill Seed has provided sufficient evidence to overcome summary judgment on the question of whether Caudill Seed's processes afforded it a competitive advantage which was misappropriated by Jarrow Formulas. We re-

iterate that "[w]hether a particular type of information constitutes a trade secret is a question of fact." *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 671 (E.D.Ky. 2009). Nothing in this opinion should be construed as a finding that Caudill Seed has met its burden to establish that its proprietary information constitutes trade secrets. Rather, we find only that Caudill Seed has identified what it claims to be trade secrets with the requisite particularity to overcome summary judgment.

■ Jarrow Formulas has filed a motion *in limine* to preclude the testimony of William E. Wingate, III, Caudill Seed's expert on damages. It notes generally that a trade secrets plaintiff is only entitled to damages caused by misappropriation, citing *PFS Distrib. Co. v. Raduechel*, 574 F.3d 580, 589 (8th Cir.2009) and KRS 365.884. It argues that Wingate's opinion on damages is unreliable because (1) he accepted what he was told by Caudill Seed without independent verification; (2) the calculation of costs cover an overly expansive period of time, (3) he used a gross cost figure which fails to segregate costs which are attributable to the alleged trade secrets, and (4) the costs were not allocated among the various trade secrets alleged.

On summary judgment, Jarrow Formulas again attempts to parse and compartmentalize the trade secret allegations. However, Caudill Seed's theory is that Jarrow Formulas took *all* of Caudill Seed's proprietary information which allowed for it to develop a business in activated glucoraphanin production in approximately four months—essentially a turnkey operation—thanks to the "blueprints" taken from Caudill Seed and implemented by Ashurst for Jarrow Formulas. There is testimony offered by Caudill Seed that Caudill Seed's research department was left in such disarray with key background and development information on its activated glucoraphanin formula and the manufacture of myrosinase and sulforaphane that it took six to nine months to reassemble its materials and begin to look for a new chief science officer. Caudill Seed had to go to a number of its subcontractors to piece together the lost information before it could continue to develop an activated product. It was unable to meet the anticipated rollout schedules for a number of customers with whom it had negotiated due to the setbacks after Ashurst left. Further, it was not able to bring an activated product to market until 2013, two years after Jarrow Formulas. See, D.N. 133-4, PageID#6899, D N. 133-5, PageID# 6911-6912, D.N. 133-5, PageID# 6921-6925, D.N. 133-19, PageID# 7037, D.N. 133-19, PageID# 7049. Jarrow Formulas' suggestion that Caudill Seed has offered no evidence of damage suffered is clearly incorrect. *Pfahler v. Nat'l Prods. Co.*, 517 F.3d 816, 837 (6th Cir.2007)("[P]laintiffs have demonstrated that there is a factual issue with respect to whether [the] suffered damages and the amount of damages to which [they are] entitled if plaintiffs are successful.").

There remains a genuine issue of material fact concerning whether Jarrow Formulas caused damage to Caudill Seed, but Caudill Seed has come forward with sufficient facts alleging damages to establish a genuine issue for trial. Caudill Seed has produced its expert's report attempting to quantify these alleged damages. Much of Jarrow Formulas' motion *in limine* to preclude this expert testimony [10] attacks the factual foundation for his damage calculation. These fact-based arguments are dependent upon the proof at trial such as whether Caudill Seed can prove compensable lost business opportunities and com-

---

10. The motion has not been fully briefed, as Caudill Seed sought to stay consideration of the motion. The court will order that the matter be fully briefed and will only address the motion to the extent that it is relevant to disposition of the present motion.

pensable lost profits on future sales of goods to Jarrow Formulas. Similarly, Jarrow Formulas takes issue with the inclusion of R & D expenses over a 17-year period which it claims were unrelated to the trade secrets alleged in this case. Clearly, Wingate's damage calculations are only as good as the Caudill Seed's proof of them. However, Jarrow Formulas' "junk in, junk out" theory [11] does not reach the methodology of the calculation, but rather attacks the factual foundation upon which the calculations are premised, going to the weight of the evidence.

Jarrow Formula's particular issues with the reliability of Wingate's damages calculations can be addressed at an appropriate time prior to or during trial. For summary judgment purposes, however, Jarrow Formulas has not established that no genuine issue of material fact exists and that it is entitled to a summary judgment finding of no damages as a matter of law.

### B. Jarrow Formulas' Counterclaims

 Caudill Seed marshals several reasons to grant it summary judgment on Jarrow Formulas' counterclaims, but its chief rallying cry is that each of the counterclaims [12] requires proof of damages and that Jarrow Formulas has failed to prove it suffered some harm. It is true that standing for, and recovery on, each of the eight counterclaims requires proof of injury. *See, e.g., Farmers Bank and Trust Co. of Georgetown, Ky. v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky.2005) (listing "injury" as one of the six elements of a fraud claim); *Peterson v. Cellco P'ship.*, 164 164 Cal.App.4th 1583, 80 Cal. Rptr.3d 316, 321 (2008) ("only plaintiffs who have suffered actual damage may

pursue a [California unfair competition claim] ... he or she must demonstrate injury in fact *and* a loss of money or property caused by unfair competition" (emphasis in original)); *Alderman v. Bradley*, 957 S.W.2d 264, 267 (Ky.App.1997) (noting the type of injury required for a negligence *per se* claim); KRS § 355.2–714 (describing the damages element of U.C.C. breach of warranty and breach of contract claims); *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 6 (Ky.App. 2012) (listing "damages" as a required element of tortious interference claims); *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, —— U.S. ——, 134 S.Ct. 1377, 1395, 188 L.Ed.2d 392 (2014) ("[t]o invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations").

Jarrow Formulas' retort, when addressing its Lanham Act claim at least, is that Caudill Seed has confused the injury requirement. It argues that its counterclaims require only a showing that "a reasonable jury could infer that it was harmed." D.N. 135, PageID # 7989 (citing *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 689 (6th Cir.2000). And it reiterates that Senior Judge Heyburn, *see* D.N. 89, PageID # 3463, had already determined that Jarrow Formulas had standing to bring the claim, in part, because it had properly alleged that Caudill Seed's actions had proximately caused it harm.

A reasonable jury could not conclude that Jarrow Formulas was harmed. There is little to no evidence that Jarrow Formu-

---

**11.** See Bernstein, Hon. Mark I., *Jury Evaluation of Expert Testimony under the Federal Rules*, 7 Drexel L. Rev. 239 (Spring 2015).

**12.** Again, those counterclaims are: (1) fraudulent inducement; (2) California statutory un-

fair competition; (3) negligence per se; (4) breach of contract; (5) breach of implied warranties; (6) tortious interference; (7) declaratory judgment; and (8) Lanham Act false advertising.

las actually suffered from Caudill Seed's sale of irradiated seeds. Rather than trying to rectify an actual injury, Jarrow Formulas' filing of these counterclaims smacks of sour grapes from being dragged into this lawsuit. Despite its suspicions,[13] it rejected no shipments and never tested for irradiation. Instead, Jarrow Formulas kept selling—at a profit—BroccoMax that was made with irradiated seeds. In fact, Jarrow Formulas' BroccoMax sales increased during each of the pertinent years. *See* D.N. 137-3, PageID # 8953-54. It used all but five pounds of the seeds it purchased from Caudill Seed, and it never recalled the supplements [14] that contained the irradiated products, even after the state court documents proving irradiation were made available to it. Despite alleging that companies who sell products in violation of FDA regulations could be subject to governmental penalties and "severe reputational harm," Jarrow Formulas provides no indication that it suffered any such penalties or reputational harm. *See* D.N. 91, PageID # 3480-81. Caudill Seed's wrongdoing had no material negative effect on Jarrow Formulas, Caudill Seed may in fact have broken the law and breached its contracts with Jarrow Formulas, but Jarrow Formulas suffered no apparent harm because of Caudill Seed's actions. For this reason and the others described below, the Court will grant Caudill Seed's requested summary judgment as to each of Jarrow Formulas' claims.

### i. *Fraudulent Inducement, Negligence Per Se, and Tortious Interference Claims*

Each of these tort claims includes proof of injury as an element for making a prima facie case. But each tort claim fails for other reasons. Most notably, each fails because of the economic loss rule.

Kentucky adopted the economic loss rule in 2011. *See Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky.2011). This doctrine prevents buyers of commercial goods from recovering, via tort suits, for economic losses deriving from the manufacture of the product. *Id.* at 733. The rationale behind the rule is to keep contract law from "drown[ing] in a sea of tort." *Id.* (quoting *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)). The rule creates a bifurcation: economic losses that deprive the purchaser of "the benefit of his bargain ... are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code," while "[l]osses for injuries to people and to 'other property,' in these commercial transactions, remain subject to the traditional product liability theories." *Id.* at 738 (citations omitted). In *Giddings*, the Kentucky Supreme Court expressly said that the economic loss rule extended beyond negligence and strict liability claims to negligent misrepresentation claims, but it put off considering whether the doctrine would cover fraud claims. *Id.* at 733.

Even if Jarrow Formulas did have evidence of injury, the types of harms it complains of—the diminished value of its product and the consequential damages related to its purchase of irradiated seeds—are all economic harms flowing from the contracts between these parties. Though Jarrow Formulas made the vague asser-

---

**13.** Not to mention the evidence indicating that Jarrow Formulas knew of the irradiation earlier than it now lets on.

**14.** Jarrow Formulas' own recall policies require it to recall any product that does not comply with FDA regulations. It is telling, then, that Jarrow Formulas claims the irradiated seeds do not conform but has so far failed to recall the products it made with them.

tion in briefing that the consumption of irradiated products could have adverse health effects, it has cited no proof of any such harm to its customers. It has produced no proof of harm to any person or any other property. The economic loss rule applies here and precludes recovery on these claims.

Jarrow Formulas' disputes the economic loss rule applies. As to fraudulent inducement and negligence *per se*, it argues that if the Kentucky Supreme Court were presented with a fraud case, it would not subsume fraud claims under the economic loss rule. Jarrow Formulas' contention is based on cases from other states, like Texas and Virginia, that have determined that the prevention of fraud is an important enough public policy goal to warrant removing fraud claims from the economic loss rule's purview, even when the fraud has to do with the quality of the goods sold. *See, e.g., Formosa Plastics Corp. USA v. Presidio Eng'r & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex.1998). It also divines meaning from the Kentucky Supreme Court's choice not to address fraud in *Giddings*. Though the cases from outside Kentucky have persuasive merit, this Court has previously indicated its belief that—where fraudulent inducement claims are "inextricably intertwined with . . . breach-of-contract claim[s]"—Kentucky courts would preclude recovery under the economic loss rule. *See Derby City Capital, LLC v. Trinity HR Servs.*, 949 F.Supp.2d 712, 727–28 (W.D.Ky.2013) (Russell, J.). Because any fraud here relates solely to condition of the goods, any fraud claims are necessarily inextricably intertwined with the contract requirements. And *Giddings* opinion's discussion of fraud claims should not be construed as the Kentucky Supreme Court tipping its hand on the matter. Rather, the Kentucky Supreme Court chose not to address the fraud claim's relation to the economic loss rule because it did not need to: the fraud

claim was fatally flawed regardless of the economic loss rule, *Giddings*, 348 S.W.3d at 733 (as to fraud, "that issue awaits another case because the plaintiffs in this case pled fraud by omission, a claim that is unsustainable on the record before us").

 Regarding tortious interference, Jarrow Formulas' contention is that the economic loss rule cannot apply because each of the contracts was between Jarrow Formulas and C.S. Health, not Caudill Seed. In the "classic tortious interference" case, "a third party disrupts the successful fulfillment of a contract." *Ventas, Inc. v. Health Care Prop. Investors, Inc.*, 635 F.Supp.2d 612, 620 (W.D.Ky.2009). Jarrow Formulas' claim is that Caudill Seed, a third party, interfered with the contract between C.S. Health and Jarrow Formulas when Caudill Seed provided the irradiated seed to C.S. Health that C.S. Health then provided it to Jarrow Formulas. Because the governing contract in this transaction was between Jarrow Formulas and C.S. Health, Jarrow Formulas argues that the economic loss rule is inapplicable to its dispute with Caudill Seed given that any dispute between them would be extra-contractual. Caudill Seed retorts with a Sixth Circuit case, *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co. Ltd.*, 475 F.3d 783 (6th Cir.2007), where, applying Michigan law, the court concluded that the two defendants—"Moog" and "TSS"—though separate legal entities, had a "unity" to where they were "functionally only one corporation, Moog, which could not induce a breach in what was in effect its own contract." *Id.* at 801. Likewise, Caudill Seed now argues that it and. C.S. Health have "aligned interests and effectively operated as one in providing product to Jarrow Formulas." D.N. 137, PageID # 8924. Jarrow Formulas disputes this, taking particular issue with Caudill Seed's claim that C.S. Health is a wholly owned subsidiary

of Caudill Seed. *See, e.g.*, D.N. 135, PageID # 8007-10.

The Court agrees with Caudill Seed's view. Caudill Seed has, from the beginning, put forth C.S. Health as its wholly owned subsidiary. *See* D.N. 1, PageID # 3 ("[t]hrough its wholly owned subsidiary, CS Health LLC, Caudill Seed also sells ingredients for nutritional supplements, foods and cosmetics."). Even Jarrow Formulas recognized in pleadings that the two Caudill entities share the same principal place of business in Louisville; would be jointly and severally liable for any injury done to Jarrow Formulas; that C.S. Health was once an internal division of Caudill Seed that was spun off as a separate company in April 2010; and that "the management of C.S. Health is identical to that of Caudill Seed, in that Edgar Patton Caudill serves as the sole Member and Manager of C.S. Health and the President and CEO of Caudill Seed." D.N. 21, PageID # 204-05. Though the contracts may have nominally been between C.S, Health and Jarrow Formulas, it appears that in practice there was little, if any, difference between the two Caudill entities when it came to fulfilling Jarrow Formulas' order. The Court agrees that the two Caudill entities operated as one, and the Court maintains that the economic loss rule precludes this claim.

### ii. California Statutory Unfair Competition Claim

■ Jarrow Formulas' California unfair competition claim has been preempted, Caudill Seed argues that the federal Food, Drug, and Cosmetic Act, the Dietary Supplement Health and Education Act, or both, preempt Jarrow Formulas' state law claim. It contends that Congress "intended to occupy the entire field of dietary supplement regulation" D.N. 124-1, PageID # 4008. Jarrow Formulas' responds that, at a "minimum, Jarrow's claims based upon 'fraudulent' business practices do not depend on proof of violation of law, and

can be supported solely on Caudill Seed's false certifications that its product was non-irradiated." D.N. 135, PageID # 7992. But Caudill Seed maintains that preemption is a question of federal law, *Quevado v. Macy's, Inc.*, 798 F.Supp.2d 1122, 1130 n. 3 (C.D.Cal.2011), and that the Sixth Circuit has already determined that "private litigants may not 'bring a state-law claim against a defendant when the state-law claim is in substance (even if not in form) a claim for violating the FDCA[.]' " D.N. 137, PageID # 8922 (citing *Loreto v. Procter & Gamble Co.*, 515 Fed.Appx. 576, 579 (6th Cir.2013)). Because the fraud alleged is that Caudill Seed sent Jarrow Formulas seeds that failed to conform to federal regulations, the basis of this claim, as with the others, depends in part of whether the seeds conformed to federal regulations. Thus, the claim in substance is about an FDCA violation, which has been preempted by Congress' occupation of the field.

### iii. Claims for Breaches of Contract and Implied Warranties

■ Beyond wanting for proof of harm. Caudill Seed also argues that Jarrow Formulas' U.C.C. claims for breach of contract and express and implied warranties are unviable for three additional reasons: (1) Jarrow Formulas accepted the product it purchased and resold it as part of its supplement; (2) Jarrow Formulas is barred because it did not adhere to the notice provision found in KRS § 355.607(3)(a); and (3) Jarrow Formulas waived any claims because it accepted the goods with knowledge of nonconformity. Jarrow Formulas disputes each argument, but the primary basis of its defense is that there is a genuine issue of material fact as to when it knew the seeds were irradiated. *See* D.N. 135, PageID # 7997. A reasonable jury would side with Caudill Seed on these disputes because Jarrow Formulas

knew or should have known about the irradiation and because Jarrow Formulas accepted and resold the seeds as part of its supplement.

Several aspects of the record indicate that Jarrow Formulas knew of the irradiation much earlier than it claimed in briefing. In his deposition, Jarrow Rogovin admitted he became suspicious that his company had received irradiated product in May 2011-D.N. 137-4, PageID # 8959. Rogovin said he had these suspicions because he did not trust Dan Caudill and because Ashurst had told him that Caudill Seed was sending irradiated seed. *Id.* And though he denied knowing of a way to test for irradiation, he said that if he had known of a way, he would have tested for it. *Id.* Ben Khowong, Jarrow Formulas' chairman, said in his deposition that "in June 2011 [he] was informed that test results" showed two issues with the Caudill Seed product, including that the seeds had been irradiated. D.N. 137-5, PageID # 8962. He further explained that he learned of the irradiation from Rogovin. *Id.* And, of course. Jarrow Formulas hired Ashurst—who admitted he had sent irradiated product to Jarrow Formulas— away from Caudill Seed. *See* D.N. 137-6, PageID # 8967. In sum, Jarrow Formulas knew or had reason to know of the irradiation earlier than it claimed in briefings. Yet it used the non-conforming products and even kept purchasing them after it learned of the irradiation. It accepted these goods, *see* KRS § 355.2–602(1) and 355.2–607(2), and its acceptance waived its contract claims. *See Peters Wholesale Furniture, Inc. v. Manchester Furniture Group*, No. 3:04–cv–686-H, 2015 WL 2372046, at * 2 (W.D.Ky. Sept. 26, 2005).

*iv. Declaratory Judgment Claim*

Jarrow Formulas seeks a declaration that, essentially, Jarrow Rogovin did not instruct Kean Ashurst to provide, and that Ashurst did not provide, the trade secrets that Caudill Seed claims were stolen. *See* D.N. 21, PageID 216. It is unclear this claim is even proper because it relates only to factual matters. *See AmSouth Bank v. Dale*, 386 F.3d 763, 785–88 (6th Cir.2004). Regardless, the Court addresses these factual matters in the section of this Memorandum Opinion relating to Caudill Seed's claims.

*v. Lanham Act False Advertising Claim*

Jarrow Formulas' Lanham Act claim also fails. In 2014, the Supreme Court clarified that a plaintiff suing under the Act "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when the deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, — U.S. ——, 134 S.Ct. 1377, 1390–91, 188 L.Ed.2d 392 (2014). Jarrow Formulas has pointed to no evidence indicating that the acts of Caudill Seed caused consumers to withhold trade from Jarrow Formulas, Indeed, as noted above, Jarrow Formulas' sales actually *increased.* Its Lanham Act claim cannot proceed.

**V. Conclusion**

For the reasons stated above, the Court will grant summary judgment on in favor of Caudill Seed on Jarrow Formulas' counterclaims. Jarrow Formulas' motion for summary judgment will be denied. A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED** this <u>28TH</u> day of October, 2015.